preserve both the attorney-client and attorney-work-product privileges and that a limited disclosure pursuant to a government agency's investigatory request ought not waive the privileges as to all other parties, I respectfully dissent from the court's affirming of the district court's order compelling discovery of the otherwise privileged material in question.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2002 FED App. 0201P (6th Cir.)
File Name:  02a0201p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

In re: COLUMBIA/HCA
HEALTHCARE CORPORATION
BILLING PRACTICES
LITIGATION.

No. 00-6059

---

TENNESSEE LABORERS
HEALTH & WELFARE FUND;
BOARD OF TRUSTEES OF THE
CARPENTERS & MILLWRIGHTS
OF HOUSTON & VICINITY
HEALTH AND WELFARE
TRUST FUND; BOARD OF
TRUSTEES OF THE PIPEFITTERS
LOCAL 522 HOSPITAL,
MEDICAL AND LIFE BENEFIT
FUND; OPERATING ENGINEERS
LOCAL 312 HEALTH &
WELFARE FUND; UNITED
PAPERWORKERS
INTERNATIONAL UNION;
CORDULA BOYSEN,
        *Plaintiffs-Appellees,*

*v.*

COLUMBIA/HCA
HEALTHCARE CORPORATION,
*Defendant-Appellant.*

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 98-01227—Thomas A. Higgins, District Judge.

Argued: January 22, 2002

Decided and Filed: June 10, 2002

Before: BOGGS and MOORE, Circuit Judges; RUSSELL,
District Judge.*

———————————

**COUNSEL**

**ARGUED:** Richard P. Bress, LATHAM & WATKINS, Washington, D.C., for Appellant. David S. Stellings, LIEFF, CABRASER, HEIMANN & BERNSTEIN, New York, New York, for Appellees. **ON BRIEF:** Richard P. Bress, Peter L. Winik, LATHAM & WATKINS, Washington, D.C., for Appellant. David S. Stellings, Erik L. Shawn, Richard M. Heimann, LIEFF, CABRASER, HEIMANN & BERNSTEIN, New York, New York, Morris A. Ratner, LIEFF, CABRASER, HEIMANN & BERNSTEIN, San Francisco, California, Jane B. Stranch, BRANSTETTER, KILGORE, STRANCH & JENNINGS, Nashville, Tennessee, for Appellees.

———————————

\* The Honorable Thomas B. Russell, United States District Judge for the Western District of Kentucky, sitting by designation.

**B. Waiver of the Attorney-Work-Product Privilege**

The court also holds today that Columbia's voluntary disclosure to the government of materials protected by the attorney-work-product privilege waives that privilege as well. Op. at 29-30. I believe that the reasons why the attorney-client privilege should not be waived by a disclosure to the government are also sufficient to bar waiver of the attorney-work-product privilege under similar circumstances. Some courts have decided that the requirements for waiver of the attorney-client and the work-product privileges are different. *See, e.g.*, *In re Permian Corp.*, 665 F.3d 1214, 1219 (D.C. Cir. 1981). Indeed, courts have explicitly held that "while the mere showing of voluntary disclosure to a third person will generally suffice to show waiver of the attorney-client privilege, it should not suffice in itself for waiver of the work product privilege." *United States v. AT&T*, 642 F.2d 1285, 1299 (D.C. Cir. 1980). Unlike the attorney-client privilege, the work-product privilege is explicitly protected by a federal rule of civil procedure, which makes no provision for waiver of the privilege. *See* Fed. R. Civ. P. 26(b)(3).

The court contends that the only difference between the two standards is that attorney work product may be disclosed to non-adversaries, through the so-called "common interest exception," without waiving the privilege. Op. at 29-30. Other courts, however, have explicitly rejected the claim that the two waiver standards are identical, except for the "common interest exception." For example, the District of Columbia Circuit has held that "the purposes of the work product privilege are more complex, and they are not inconsistent with selective disclosure — even in some circumstances to an adversary." *In re Sealed Case,* 676 F.2d 793, 818 (D.C. Cir. 1982).

In any event, I would also hold that the public interest in easing government investigations counsels against holding the attorney-work-product privilege waived when the holder of the privilege discloses privileged information to the government. Because I believe that Columbia intended to

Plus, the exception is as rule-like as this court makes it, and thus the cure for this defect lies in our own hands. If the jurisprudence that this exception would produce contains a series of "difficult and fretful" exercises in "linedrawing," Op. at 24, this court would have no one to blame but itself.

Because of a similar concern for the preservation of rule-like values in the field of privilege, I would make the exception categorical. There would undoubtedly be some voluntary disclosures to the government that would occur without the exception. The benefits of such a disclosure to the government may, in some cases, be so great for the private party that they would outweigh the massive costs of a full subject matter waiver of privilege.[4] Nevertheless, a rule removing the penalty of waiver from all disclosures of privileged information to the government would provide the certainty necessary to encourage cooperation with the government.

Another problem with the rule-like features of the exception is that the exception may have limited efficacy absent uniformity among courts. It would be difficult to remove the disincentive to cooperate with the government if protection from waiver depended on the circuit in which a party would be eventually involved in litigation. The mere split between our sister circuits should not dissuade us from adopting the exception. This court should follow the legal position that it finds most meritorious and leave the problem of uniformity to a higher court.

---

[4]Or, in some cases, the costs of subject matter waiver just may not be so high that it is not a significant deterrent to cooperation with the government.

RUSSELL, D. J., delivered the opinion of the court, in which MOORE, J., joined. BOGGS, J. (pp. 31-44), delivered a separate dissenting opinion.

_____

## OPINION
_____

RUSSELL, District Judge. This action is an interlocutory appeal from an order of the district court compelling Columbia/HCA Healthcare Corporation ("Columbia/HCA") to produce certain otherwise privileged documents. Columbia/HCA having previously produced the documents to the Department of Justice ("DoJ"), the Health Care Finance Administration and other related governmental agencies, the district court concluded that the company had waived any privilege associated with the documents. Because the Court agrees that the district court properly rejected the selective waiver argument presented by Columbia/HCA, we **AFFIRM**.

### BACKGROUND

The underlying facts of this action, at least as they pertain to the instant appeal, are relatively simple. The Department of Justice began investigating Columbia/HCA in the mid 1990s for possible Medicare and Medicaid fraud. Columbia/HCA, either in response to the investigation or in anticipation of it, conducted several internal audits[1] of its Medicare patient records. The Coding Audits pertained not only to Columbia/HCA itself, but nearly all of its subsidiary and related corporations. The audits examined the various billing codes assigned to the patients in order to receive reimbursement from the Medicare program, and any possible miscoding (deliberate or otherwise) of the Medicare patients. When DoJ attempted to obtain the audits, Columbia/HCA

---

[1]Columbia/HCA refers to these internal audits as the "Coding Audits," and for reasons of convenience and consistency, the Court adopts this term as well.

rebuffed the request based on attorney-client privilege and the work product doctrine.

A change in corporate control at Columbia/HCA led the company to engage in negotiations with the Government about a possible settlement of the fraud investigation. In coordination with this effort, Columbia agreed to produce some of the Coding Audits and related documents to the Government. In exchange for this cooperation, DoJ agreed that certain stringent confidentiality provisions would govern its obtaining of the documents. As relevant to the instant appeal, the agreement provided that:

> [t]he disclosure of any report, document, or information by one party to the other does not constitute a waiver of any applicable privilege or claim under the work product doctrine. Both parties to the agreement reserve the right to contest the assertion of any privilege by the other party to the agreement, but will not argue that the disclosing party, by virtue of the disclosures it makes pursuant to this agreement, has waived any applicable privilege or work product doctrine claim.[2]

Ultimately, DoJ and Columbia/HCA reached a settlement of the fraud investigation, which resulted in Columbia/HCA paying a $ 840,000,000 fine to the Government. The sum represented criminal penalties as well as civil remuneration to the Government for overcharges incurred due to the miscoding of Medicare patients.

Once the nature, extent and results of the DoJ investigation came to light, private insurance companies and private individuals undertook to evaluate the billing they received from Columbia/HCA. This review resulted in the filing of numerous lawsuits around the country, which the Panel on Multidistrict Litigation transferred to the Middle District of

---

[2]Other paragraphs contained in the agreement grant DoJ the ability to transfer the information to other governmental agencies as well as to congressional committees for certain purposes.

raise decision costs. It would only apply when the disclosure was made to a government agency. It seems pretty simple to know what government agencies are. We might place a confidentiality agreement requirement on the exception.[3] Really, the exception seems clear and predictable.

The court's argument is more sophisticated, however. It claims that it would be difficult to distinguish between the government and several types of private parties who act particularly in the public interest. Op. at 24. A *qui tam* plaintiff, for example, brings a suit in the government's stead. *See* 31 U.S.C. 3730(b)(1). More tenuously, a plaintiff in a shareholder derivative action seeks recovery for the corporation, at least in addition to himself. The claimed risk of attempts to stretch the exception seems tenuous to me. At least the Eighth Circuit has had the exception in place for twenty-four years, *see Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 611 (8th Cir. 1978) (*en banc*), and I can find no case in which a litigant has pressed the exception in these situations. Nevertheless, the quasi-governmental actors listed here seem categorically different. The difference between these actors and the government is that they stand to recover personally, and the prospect of personal recovery changes the incentives for bringing and prosecuting their actions in the first instance. *See* 31 U.S.C. § 3730(d) (providing substantial awards to *qui tam* plaintiffs if they recover for the United States). In short, because of the potentially massive recovery that both *qui tam* and derivative suit plaintiffs stand to receive *personally*, the assurance that their activities are *as much* in the public interest as government agency conducted investigations seems absent.

---

[3]A word about the relevance of the confidentiality agreement seems appropriate. I agree with the other courts addressing this issue that parties cannot create a privilege against civil discovery by mere written agreement. *See Westinghouse*, 951 F.2d at 1426. The relevance of the confidentiality agreement, however, is as evidence that the holder of the privilege *intended* to preserve the privilege against all parties other than the government. Without such a confidentiality agreement, we could imply from the disclosure a lack of concern about the privilege.

the silent premise of the court's argument: private parties would disclose privileged material to the government regardless of the existence of an exception. If the holders of the privilege did not disclose privileged information to the government, the material would still be protected by the privilege. In short, the choice presented in this case is not one whether or not to release privileged information to private parties that has already been disclosed to the government, but rather one to create incentives that permit voluntary disclosures to the government at all. In the run of cases, either the government gets the disclosure made palatable because of the exception, or neither the government nor any private party becomes privy to the privileged material.

The court finally makes a type of moral argument. Why should the government sully its hands, the court asks, by assisting in "obfuscating the 'truth-finding process'"? Op. at 24. The government is not about cover-ups, rather it should "act to bring to light illegal activities." *Ibid.* I wonder what exactly the court thinks the government would be doing if permitted to encourage voluntary disclosure through confidentiality agreements. The government either could use the information to find additional evidence or could present the privileged information if it decided to initiate a criminal prosecution or civil action. In any event, the court's argument misses the mark. It is not the government's confidentiality agreement that shields the information from civil discovery by private parties, but instead the privilege itself. Without the exception, much otherwise disclosed material would stay completely in the dark, under the absolute cover of privilege. The exception aids the government in bringing violations of the law to light.

The theoretical merits of the exception aside, the court questions the administrability of the rule that it rejects. Op. at 24. In essence, the court suggests that the exception lacks rule-like features and that, as a result, the exception would dramatically increase judicial decision and private litigation costs. At first glance, it not entirely clear why the exception at issue would be more standard-like, threaten certainty, and

Tennessee.[3] The various plaintiffs[4] contend that like the Health Care Finance Administration, Columbia/HCA overbilled them for various services. The litigation seeks the recovery of excess sums tendered by the Private Payors to Columbia/HCA.

The Private Payors sought an order from the district court compelling Columbia/HCA to produce the Coding Audits. According to the Private Payors, the billing codes used by Columbia/HCA for Medicare billing were also used in calculating charges paid by the Private Payors. Thus, the Coding Audits would contain highly relevant information pertaining to alleged overbilling by Columbia/HCA to these persons and insurance funds. Importantly, the Private Payors alleged that notwithstanding whatever privilege the Coding Audits may have once held, Columbia/HCA waived the protections of those privileges by disclosing the materials to the Government.

As it had initially with DoJ, Columbia/HCA refused to produce the Coding Audits on grounds of the work product doctrine and attorney-client privilege. It argued that based on case law from other jurisdictions, disclosing the information to the Government did not waive the protections of the two privileges. *See generally Diversified Industries, Inc. v.*

---

[3] The court below entered a stay pursuant to the All-Writs Act, 28 U.S.C. § 1651, staying any actions remaining in state court pending the outcome of the instant appeal. The stay also applies to the MDL actions pending before it. *See In re Columbia/HCA Healthcare Corporation Billing Practices Litigation*, 93 F. Supp. 2d 876 (M.D. Tenn. 2000).

[4] Innumerable plaintiffs are involved in the MDL and related state-court actions. Participating in this appeal are the Tennessee Laborers Health and Welfare Fund; the Board of Trustees of the Carpenters & Millwrights of Houston and Vicinity Health and Welfare Trust Fund; the Board of Trustees of the Pipefitters, Local 522, Hospital, Medical and Life Benefit Fund, Operating Engineers Local No. 312 Health and Welfare Fund; United Paper Workers International Union; and Cordula Boysen. These parties refer to themselves in the record as "the Private Payors," and the Court will adopt this term as well.

*Meredith*, 572 F.2d 596 (8th Cir. 1978) (en banc). Moreover, Columbia/HCA pointed out that in disclosing the information to the Government, it had expressly reserved the right to assert attorney-client privilege and the work product doctrine pursuant to the confidentiality agreement negotiated with DoJ.

In a published opinion, the court below granted the motion to compel. *In re Columbia/HCA Healthcare Corporation Billing Practices Litigation*, 192 F.R.D. 575 (M.D. Tenn. 2000). After first noting that this Court had not spoken on the issue, the district court examined the approaches taken by other courts, including the Eighth Circuit in *Diversified Industries*. Relying heavily on the opinion of the First Circuit in *United States v. Massachusetts Institute of Technology*, 129 F.3d 681 (1st Cir. 1997), it found that "voluntary disclosure of privileged materials to the government constitutes a waiver of the attorney-client privilege to all other adversaries." *In re Columbia/HCA Healthcare*, 192 F.R.D. at 579. Turning to the Third Circuit for support, *see Westinghouse Electric Corp. v. Republic of the Philippines*, 951 F.2d 1414 (3d Cir. 1991), the court below also found that by disclosing the documents to DoJ, Columbia/HCA waived any protections under the work product doctrine as well. *In re Columbia/HCA Healthcare*, 192 F.R.D. at 579-80.

However, the court did find that the case presented a "controlling question of law as to which there is a substantial ground for difference of opinion," and certified its decision on the issue for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). A previous panel of this Court ruled that immediate appeal was proper in this case. The panel found that the resolution of the issue presented "may materially advance the ultimate termination of the litigation." *Cardwell v. Chesapeake & Ohio Railway Co.*, 504 F.2d 444, 446 (6th Cir. 1974); *see* 28 U.S.C. § 1292(b)(same).

In its appeal, Columbia/HCA renews the arguments it presented to the court below. It contends that this Circuit should adopt the approach of the Eighth Circuit in *Diversified Industries* and reject the "all-or-nothing" methodology

---

Why should we minimize the cost and maximize the accuracy of government investigations? After all, as the court notes, private litigants also seek the truth and could benefit from the decreased costs of discovery and the increased accuracy of their positions and arguments. Op. at 24. They too, through the adversarial process, serve the truth-seeking mission with which courts are charged.

The government's investigations are generally more important. Government officials, with finite litigative resources and no individual monetary stake in the outcome of litigation, generally are more selective regarding the matters they choose to pursue than are private parties. Because of these incentives, government investigations are more likely to be in the public interest. Private litigants, often encouraged by large potential liability, on balance will have a greater incentive to press the legal envelope and to pursue legal actions less certainly within the public interest.

The differential remedies available to public and private parties also reflect the greater importance of government investigations. The government has the authority to seek imprisonment and punitive fines. The costs and benefits of government investigations are diffuse, and therefore managing those costs and benefits most efficiently is definitionally in the public interest. On top of all this, government investigators and prosecutors start at a tactical disadvantage to private plaintiffs given the procedural protections afforded criminal defendants against the government, such as a higher burden of proof and the privilege against self-incrimination. I am comfortable, therefore, providing a clear exception for government investigations, and leaving private litigants out.

Throughout its opinion, the court suggests that recognition of an exception would deprive private parties of evidence to which they would otherwise be entitled. *See* Op. at 24 (characterizing the exception as a government investigatory tool "which effectively prevents future litigants from obtaining the same information"). It is important to identify

privileged information to a third party.   Plus, the waiver covers not just the documents disclosed, but all privileged documents "pertaining to the subject matter of the disclosure." *See, e.g., Collis*, 128 F.3d at 320; *Painewebber Group, Inc. v. Zinsmeyer Trusts Partnership*, 187 F.3d 988, 992 (8th Cir. 1999).  These features combine significantly to penalize the revelation of privileged information to the government.    Relatively narrow cooperation with the government in the form of a disclosure of privileged information can expose an individual or firm to massive liability and reveal privileged documents far afield from the disclosure itself.

Contrary to the court's argument, increased access to privileged information increases the absolute efficacy of government investigations, regardless of increased investigatory costs to the government.   There is some evidence provided by privileged information for which there is no non-privileged substitute or to which there is no path without the privileged evidence.   The court, as well as other courts addressing this question, argues that the government has "other means" to secure the information that they need, while conceding that those other means may consume more government time and money.   Op. at 24; *Massachusetts Inst. of Tech.*, 129 F.3d at 685.   Presumably, the court is referring to search warrants or civil discovery.   It should be emphasized, however, that the government has no other means to secure otherwise privileged information.   That the documents or other evidence sought is privileged permits the target of an investigation to refuse production through civil discovery, to quash any subpoena *duces tecum*, or to prevent the admission of the privileged information even by the government.   The only way that the government can obtain privileged information is for the holder of the privilege voluntarily to disclose it.   The court's argument about the adequacy of other means, suggesting that the only difference between them and voluntary disclosure is cost, requires the premise that all privileged information has a non-privileged analogue that is discoverable with enough effort.   That premise, however, does not hold.

represented by the decision of the court below.  According to Columbia/HCA, various public policy arguments, as well as caselaw from other jurisdictions, provides support for its position.  The Private Payors encourage the Court to join the majority position and affirm the opinion of the district court.

## STANDARD

"The question of whether the attorney-client privilege applies is a mixed question of law and fact, subject to de novo review." *Reed v. Baxter*, 134 F.3d 351, 355 (6th Cir. 1998) (citing *In re Grand Jury Proceedings October 12, 1995*, 78 F.3d 251, 253-54 (6th Cir. 1996)); *see also United States v. Dakota*, 197 F.3d 821, 825 (6th Cir. 2000) ("This court reviews *de novo* a district court's decision regarding waiver of the attorney-client privilege") (citing *United States v. Collis*, 128 F.3d 313, 320 (6th Cir. 1997)).   While [t]he burden of establishing the existence of the privilege rests with the person asserting it," *Dakota*, 197 F.3d at 825 (citing *In re Grand Jury Investigation No. 83-2-35*, 723 F.2d 447, 450 (6th Cir. 1983)), in this case the parties have assumed for purposes of this appeal that the Coding Audits and related documents are covered by the attorney-client privilege and the work product doctrine.   Claims of attorney-client privilege are "narrowly construed because [the privilege] reduces the amount of information discoverable during the course of a lawsuit." *Collis*, 128 F.3d at 320 (citing *In re Grand Jury Proceedings*, 78 F.3d at 254).   The privilege "applies only where necessary to achieve its purpose and protects only those communications necessary to obtain legal advice." *In re Antitrust Grand Jury*, 805 F.2d 155, 162 (6th Cir. 1986) (citing *Fisher v. United States*, 425 U.S. 391, 403, 96 S. Ct. 1569, 1577, 48 L. Ed. 2d 39 (1975)).

The work product doctrine "is distinct from and broader than the attorney-client privilege." *In re Antitrust Grand Jury*, 805 F.2d at 163 (quoting *United States v. Nobles*, 422 U.S. 225, 238 n. 11, 95 S. Ct. 2160, 2170 n. 11, 45 L. Ed. 2d 141 (1975)).   The doctrine is designed to allow an attorney to "assemble information, sift what he considers to be the

relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference . . . to promote justice and to protect [his] clients' interests." *Hickman v. Taylor*, 329 U.S. 495, 510, 67 S. Ct. 385, 393, 91 L. Ed. 451 (1947). So-called "fact" work product, the "written or oral information transmitted to the attorney and recorded as conveyed by the client," *In re Antitrust Grand Jury*, 805 F.2d at 163, may be obtained upon a showing of substantial need and inability to otherwise obtain without material hardship. *See Toledo Edison Co. v. G.A. Technologies, Inc.*, 847 F.2d 335, 339-40 (6th Cir. 1988). However, absent waiver, a party may not obtain the "opinion" work product of his adversary; i.e., "any material reflecting the attorney's mental impressions, opinions, conclusions, judgments, or legal theories." *In re Antitrust Grand Jury*, 805 F.2d at 163-64 (citations omitted).

## DISCUSSION

### I. ATTORNEY-CLIENT PRIVILEGE

As a general rule, the "attorney-client privilege is waived by voluntary disclosure of private communications by an individual or corporation to third parties. *See In re Grand Jury Proceedings October 12, 1995*, 78 F.3d 251, 254 (6th Cir. 1996). In addition, a client may waive the privilege by conduct which implies a waiver of the privilege or a consent to disclosure." *Dakota*, 197 F.3d at 825 (citing *In re von Bulow*, 828 F.2d 94, 104 (2d Cir. 1987)). The prevailing view is that once a client waives the privilege to one party, the privilege is waived en toto. *See, e.g., Westinghouse*, 951 F.2d at 1424.

However, as evidenced by the instant case, some courts have recognized that a client may "selectively" waive the privilege.[5] And, unfortunately, "the case law addressing the

---

[5]Other courts refer to this as "limited" waiver. Unless quoting another case, we will refer to the issue as "selective" waiver for the reasons set forth by the Third Circuit in *Westinghouse*:

Of particular concern here is the feature of the waiver rule that eliminates the privilege not only with regard to the adversary to whom the information is revealed, but also with regard to all other parties. The policy justification for this feature is much more conclusory. As the court notes, the holders of a privilege ought not have the capacity to select among their opponents. Op. at 23; *In re Permian Corp.*, 665 F.2d at 1221 ("The client cannot be permitted to pick and choose among his opponents, waiving the privilege for some and resurrecting the claim of confidentiality as to others . . . ."). Implicit in this feature is some conception of fairness, that the privilege is not an entitlement to discriminate between parties who are roughly on the same footing. *See* Op. at 24. *See also In re Grand Jury Proceedings*, 219 F.3d 175, 183, 185 (2d Cir. 2000). Yet there is no reason why this amorphous appeal to "fairness" should not yield to an important public policy interest in easing governmental investigations.

The preference against selective use of privileged material is nothing more than a policy preference, and really also has very little to do with fostering frank communication between attorney and client. The question for this court is one of policy: Whether the benefits obtained by the absolute prohibition on strategic disclosure outweigh the benefits of the information of which the government has been deprived by the rule? As the harms of selective disclosure are not altogether clear, the benefits of the increased information to the government should prevail.

The court's rule does nothing more than increase the cost of cooperating with the government. The third-party waiver rule, if enforced in disclosures to the government, would require an investigated party to withhold the requested information, lest she lose the privilege entirely. While it is hard to say exactly how high the marginal costs of the waiver would be without facts in an individual case, the scope of the waiver sheds some light on the general magnitude of the costs. Under the current operation of the rule, the holder of the privilege waives it as to everyone when he discloses

circumstances under which they are waived, are conferred to the "reason and experience" of federal courts. Fed. R. Evid. 501. In exercising this authority, federal courts have regularly analyzed whether particular rules are "in the public interest," or whether the rules regarding the privilege would have undesirable side effects. These questions of "policy," like the deleterious impact of a waiver rule on government investigations, are at the heart of the privilege inquiry. *See Jaffee v. Redmond*, 518 U.S. 1 (1996) (engaging in a extensive "policy" inquiry to formulate a psychotherapist-patient privilege under federal law). I can find no rule narrowly constraining the considerations that courts may take into account in developing rules regarding a common law privilege or requiring that courts turn a blind eye to the practical effect of the privilege rules that they are charged to create.

Moreover, the second justification generally offered for the third-party waiver rule — preventing the selective invocation of the privilege — contradicts the court's premise. Reducing the client's choices to two, the complete abandonment of the privilege or preserving total confidentiality, the third-party waiver rule prevents parties from strategically deploying the most favorable privileged material while jealously guarding the most damaging. *See United States v. Workman*, 138 F.3d 1261, 1263-64 (8th Cir. 1998); *United States v. Rakes*, 136 F.3d 1, 5 (1st Cir. 1998). To the extent that a party seeks to use otherwise privileged evidence, his opponent should be able to respond with the same. Without the waiver rule, the worst of all circumstances could emerge: the court may be presented with an incomplete view of the facts, where exposed evidence would be contradicted by concealed privileged information.

Preventing the distortion of the record only justifies the topical scope of the waiver. By waiving the privilege as to the entire subject matter of the disclosure, *United States v. Collis*, 128 F.3d 313, 320 (6th Cir. 1997), the third-party-waiver rule has the effect of preventing an incomplete presentation of privileged information in a particular proceeding.

issue of limited waiver [is] in a state of 'hopeless confusion.'" *In re M&L Business Machine Company, Inc.*, 161 B.R. 689, 696 (D. Col. 1993) (citing John W. Gergacz, *Attorney-Corporate Client Privilege*, at 5-53 (2d ed. 1990). Indeed, as will be discussed *infra*, some courts have even taken internally inconsistent opinions. A review of the positions presented by the various courts reveals three general opinions on the issue – selective waiver is permissible, *see Diversified*, *supra*; selective waiver is not permissible under any situations, *see Westinghouse*, *supra*; and selective waiver is permissible in situations where the Government agrees to a confidentiality order, *see In re M&L Business Machine*, *supra* – and the Court will examine each.

### A. NO SELECTIVE WAIVER

The Eighth Circuit became the first court to recognize selective waiver in *Diversified*. The next circuit court opinion to evaluate the issue found the "'limited' waiver theory wholly unpersuasive." *Permian Corp. v. United States*, 665 F.2d 1214, 1220 (D.C. Cir. 1981) (citing *In re Weiss*, 596 F.2d 1185 (4th Cir. 1979)).[6] In *Permian*, Permian's corporate parent, Occidental Petroleum, had provided certain documents to the Securities and Exchange Commission ("SEC") regarding possible illegal bribes paid to foreign

---

Although the rule in *Diversified* is often referred to as the "limited waiver rule," we prefer not to use that phrase because the word "limited" refers to two distinct types of waivers: selective and partial. Selective waiver permits the client who has disclosed privileged communications to one party to continue asserting the privilege against other parties. Partial waiver permits a client who has disclosed a portion of privileged communication to continue asserting the privilege as to the remaining portions of the same communications. *Westinghouse*, 951 F.2d at 1423 n. 7 (citations omitted).

[6] *Weiss* also rejected *Diversified*, but did so without analysis.

officials and concomitant income tax fraud.[7]  The SEC and Occidental reached an agreement[8] that the information would be held confidential prior to its disclosure by the petroleum company. *Permian*, 665 F.2d at 1216-18.

The Department of Energy, interested in investigating whether Occidental's activities had violated certain federal energy laws, sought to obtain the documents.  Occidental, notified by the SEC that it intended to comply with the request, responded by filing suit to prevent the handover. Relying on *Diversified*, Occidental argued that a "limited" waiver had occurred when it tendered the information to the SEC.  The district court agreed with Occidental, and enjoined the Department of Energy from obtaining the information from the SEC.  *Id.*

The D.C. Circuit reversed.  It began by noting that "we cannot see how the availability of a 'limited waiver' would serve the interests underlying the common law privilege for confidential communication between attorney and client." *Id.* at 1220.

The Eighth Circuit's "limited waiver" rule has little to do with this confidential link between the client and his

---

[7]During the mid 1970s, information came to light that many of the largest corporations in the United States had paid numerous bribes to foreign officials (as well as made secretive domestic political contributions) to obtain overseas business.  The SEC initiated a "voluntary disclosure program" to encourage corporate America to reveal past misdeeds and publicly disclose the accounting and tax fraud used to hide the payments.  In exchange for "coming clean," the SEC agreed not to pursue certain enforcement actions.  In most situations, the companies created internal auditing committees which, with the assistance of outside legal counsel, prepared reports documenting the full extent any illegal practices at the company.  It is against this background that many of the reported cases discussed herein arose.

[8]Notably, this agreement provided that the SEC would not disclose the documents "to any third-party unless prior notice of such proposed disclosure has been given to Occidental." *Id.* at 1216.  In other words, the confidentiality agreement did not *absolutely* prevent disclosure.

indeed about whether she would have communicated with her attorney, absent the promise of the privilege, at time T1.  In the meantime, the client certainly has learned more about intervening events and perhaps has become more legally sophisticated (through the informed legal advice arising from her candid communication with her attorney).  It seems clear to me that *ex ante* the attorney-client privilege is generally quite important in producing the communication, and that later disclosures provide only the weakest evidence to contradict that conclusion.[2]

A more pragmatic approach would evaluate the impact of the waiver rule on the client's incentives at the time of the putative disclosure.  I introduce now, and will detail later, what I believe to be an uncontroversial behavioral prediction: Faced with a waiver of the attorney-client privilege over the entire subject matter of a disclosure and *as to all persons*, the holder of privileged information would be more reluctant to disclose privileged information voluntarily to the government than if there were no waiver associated with the disclosure. This prediction raises at least one question: Is the effect on governmental investigations the type of concern of which the waiver rule may take account?

The court suggests that the proper analysis of the waiver rule cannot include mere "public policy" considerations like the efficient dissemination of information to the government. Op. at 23.  Yet, the court's analysis ignores the common law nature of the privilege inquiry in the hands of courts.  The construction and interpretation of privileges, including the

---

[2]The court also contends that the attorney-client privilege has nothing to do with protecting communication between "a client and the government."  Op. at 22.  Of course, no one is contending that communications between the government and a private individuals are protected by the attorney-client privilege.  The only situation in which the attorney-client privilege would be relevant is when a private individual discloses *already privileged* information to the government. The question then is whether the communication between the government and the holder of the privilege *waives* the already existing privilege.  To me, the court's argument seems inapposite.

and client.  *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348 (1985).   Although some view privileges as impediments to the truth-seeking process, the calculation is that the attorney-client privilege improves the adversarial process without a net loss in the amount of information produced.   Insofar as the existence of the privilege creates the communication sought, the exclusion of privileged information conceals no probative evidence that would otherwise exist without the privilege.  The absence of the communication would leave the adversarial process with no more information and with counsel less able to present focused arguments to the courts.

Courts explaining the waiver rule note that once a client or his lawyer voluntarily reveals privileged information, the basic justification for the privilege no longer obtains.  The disclosure indicates that the privilege was not a necessary incentive for the privileged communication to occur, by demonstrating that "the client does not appear to have been desirous of secrecy." *Permian*, 665 F.2d at 1220. *See also* 8 Wigmore on Evidence § 2311, at 599 (1961).   Courts employing this explanation for the waiver rule essentially make a statistical inference: "if clients themselves divulge such information to third parties, chances are that they would also have divulged it to their attorneys, even without the protection of the privilege." *Westinghouse*, 951 F.2d at 1424.

The court's opinion also hints strongly at this type of reasoning, suggesting that the "uninhibited approach" of recognizing an exception "has little, if any, relation to fostering frank communication between a client and his or her attorney." Op. at 22.  The analysis of these courts does not account for the element of time.  Clients do not communicate with their attorneys with perfect knowledge of the future. Without the premise of perfect, or at least very good, predictive information in the hands of attorneys and their clients, there is no basis for the inference from a later disclosure to the motivation behind the privileged communication. That a client is willing to disclose privileged information to the government at time T2 indicates very little

legal advisor.  Voluntary cooperation with government investigations may be a laudable activity, but it is hard to understand how it improves the attorney-client relationship.   If the client feels the need to keep his communications with his attorney confidential, he is free to do so under the traditional rule by consistently asserting the privilege, even when the discovery request comes from a "friendly" agency.

*Id.* at 1220-21 (footnote omitted).  The court concluded that the "client cannot be permitted to pick and choose among his opponents, waiving the privilege as to some and resurrecting the claim of confidentiality to obstruct others, or to invoke the privilege as to communications whose confidentiality he has already compromised for his own benefit." *Id.* at 1221 (citations omitted).[9]  The D.C. Circuit reaffirmed this position in *In re Subpoenas Duces Tecum*, 738 F.2d 1367, 1370 (D.C. Cir. 1984),[10] stating that "[w]e believe that the attorney-client

---

[9]The Second Circuit, relying on *Permian*, held that "[t]hat Court rejected a 'pick and choose' theory of attorney-client privilege. We agree with the sentiment and note that the case before its is somewhat stronger since it does not involve an agreement with a governmental agency purporting to protect the privilege so far as other agencies are concerned." *In re John Doe Corp.*, 675 F.2d 482, 489 (2d Cir. 1982)(citing *Permian*). Ultimately, however, the *John Doe* court relied on a finding that the audit committee report in that case was prepared in furtherance of an ongoing criminal enterprise, and overruled the claim of privilege on that ground. *Id.* at 491.

The Southern District of New York, looking to *Permian*, *Westinghouse*, *In re John Doe Corp.*, and other cases, rejected selective waiver in any form, even if attempted through a confidentiality agreement. *Bowne of New York City, Inc. v. AmBase Corp.*, 150 F.R.D.465, 480 (S.D.N.Y. 1993) (holding that "even if the disclosing party requires, as a condition of disclosure, that the recipient maintain the materials in confidence, this agreement does not prevent the disclosure from constituting a waiver of the privilege; it merely obligates the recipient to comply with the terms of any confidentiality agreement." (citations omitted)).

[10]Utilizing this case for support, the Fourth Circuit subsequently affirmed its position against selective waiver of attorney-client privilege in *In re Martin Marietta Corp.*, 856 F.2d 619, 623 (4th Cir. 1988).

privilege should be available only at the traditional price: a litigant who wishes to assert confidentiality must maintain genuine confidentiality." *Id.* (quoting *Permian*, 665 F.2d at 1222).[11]

As noted previously, the Third Circuit rejected the concept of selective waiver in *Westinghouse*. Like Occidental, Westinghouse found itself under investigation for problematic dealings with foreign governments (in this case, bribes to a cohort of Ferdinand Marcos to obtain a nuclear power plant contract). *Westinghouse*, 951 F.2d at 1417-18. Westinghouse prepared certain internal audits and provided the information to the SEC and the DoJ. Once Marcos was deposed, the Philippine government brought suit against Westinghouse for wrongfully obtaining the contract through the payment of illegal bribes. *Id.* When the Philippines tried to obtain the information given to the governmental agencies, Westinghouse refused on the grounds of attorney-client privilege and work product protections. Like Occidental, it contended the disclosure to the Government was a "limited" waiver of these discovery shelters. *Id.* at 1423.

The Third Circuit rejected this argument. It found that the

Eighth Circuit's sole justification [in *Diversified*] for permitting selective waiver was to encourage corporations to undertake internal investigations. Unlike the two widely recognized exceptions to the waiver doctrine we discussed at page 1424,[12] selective waiver does not serve the purpose of encouraging full disclosure

---

[11]The Federal Circuit relied on both *Permian* and *In re Weiss* in holding that it "has never recognized such a limited waiver [of attorney client privilege]." *Genentech, Inc. v. United States International Trade Commission*, 122 F.3d 1409, 1417 (Fed. Cir. 1997).

[12]These consist of the ability of counsel to retain outside experts (such as accountants) to assist in giving legal advice to the client, and the ability of co-defendants or co-litigants to share information without waiving the privilege. *Westinghouse*, 951 F.2d at 1424 (footnote added) (citations omitted).

---

## A. The Attorney-Client Privilege

I am unpersuaded by the court's reasoning for its rejection of the exception. First and most generally, the court claims that the "attorney-client privilege [is] narrowly construed" and suggests that we should start with a presumption against Columbia's claim of privilege. Op. at 7. It is certainly true that the application of the privilege to certain communications is to be "narrowly construed," in part because it "reduces the amount of information discoverable in a lawsuit." *United States v. Collis*, 128 F.3d 313, 320 (6th Cir. 1997). Neither the parties nor the court denies that the privilege would ordinarily cover the information sought in this case. Once we decide that the attorney-client privilege applies to certain communications, the question becomes one of waiver. When the question is whether the attorney-client privilege is *waived* by certain actions, the presumption shifts in favor of preserving the privilege. As this court has recently made clear, "a court should begin its analysis with a presumption in favor of preserving the privilege." *In re Perrigo Co.*, 128 F.3d 430, 440 (6th Cir. 1997).

Second, the court suggests that the exception is "unrelated to" the justification for the attorney-client privilege, that is, encouraging "frank communication" between attorney and client. Op. at 22. Therefore, the court contends, the exception ought to be rejected.

It is not clear why an exception to the *third-party waiver rule* need be moored to the justifications of the *attorney-client privilege*. More precisely, we ought to seek guidance from the justifications for the waiver rule to which the exception is made. Those justifications are not exactly coincident with the justifications for the privilege itself. Although the philosophical pedigree of the rule is unclear, I can discern at least two frequently articulated justifications for the third-party waiver rule.

The first justification draws on the reasons behind the attorney-client privilege itself. The attorney-client privilege is designed to foster frank communication between attorney

agreement. *Permian Corp. v. United States*, 665 F.2d 1214 (D.C. Cir. 1981). Only one court of appeals has rejected the government investigation exception when the disclosing party had entered into some kind of confidentiality agreement with the government. *Westinghouse Elec. Corp. v. Republic of the Philippines*, 951 F.2d 1414, 1427-27 (3d Cir. 1991).[1] All of the other circuit decisions that the court cites either concern whether disclosures to one federal government agency waive privilege as to another federal government agency, *United States v. Massachusetts Inst. of Tech.*, 129 F.3d 681, 686 (1st Cir. 1997) (holding that disclosure to Department of Defense audit committee without a confidentiality agreement waived privilege in IRS investigation), or address privileges other than the attorney-client privilege. *See Dellwood Farms, Inc. v. Cargill, Inc.*, 128 F.3d 1122 (7th Cir. 1997) (considering waiver rules concerning the government investigatory privilege). Needless to say, the circuit courts of appeal are deeply split on whether a disclosure of privileged information to the government, in the course of an investigation and with a confidentiality agreement, waives the privilege as to all other parties. More certainly, this court has never addressed this question, and all of the authority cited, to the extent it provides any answer, does not bind our resolution of this case.

I would have resolved this open question by holding that there is a government investigation exception to the third-party waiver rule. I address the existence of this exception with regard to the attorney-client and the attorney-work-product privileges separately below.

---

[1] Even in *Westinghouse*, the court doubted that the disclosing party actually had entered into comprehensive confidentiality agreement for all of its disclosures to government agencies. *See Westinghouse*, 951 F.2d at 1427.

to one's attorney in order to obtain informed legal assistance; it merely encourages voluntary disclosure to government agencies, thereby extending the privilege beyond its intended purpose.

*Westinghouse*, 951 F.2d at 1425 (citation omitted). The court concluded disclosing information to the Government "has little relevance" to the unique role of an attorney as confidential counselor. *Id.* While recognizing the objectives of encouraging cooperation with governmental agencies and conducting internal investigations as "laudable," it disagreed with the conclusion they had anything to do with "the intended purposes of the attorney-client privilege." *Id.* (citing *Permian*, 665 F.2d at 1221).[13]

Finally, in *United States v. MIT*, *supra*, the First Circuit rejected selective waiver as well. MIT performed contract work for the Department of Defense ("DoD") to perform certain research projects. In coordination with this work, DoD audited, from time to time, the billing statements submitted by MIT. *MIT*, 129 F.3d at 683. The Internal Revenue Service ("IRS"), in the process of reviewing MIT's Section 501(c)(3) tax-exempt status,[14] sought to obtain the DoD audits. DoD stated it would not turn over the audits without MIT's consent, and MIT steadfastly refused to produce the information. MIT and DoD did not, however, have any agreement to keep the information strictly confidential. *Id.*

---

[13] The *Westinghouse* court also pointed out that in 1984, "Congress rejected an amendment to the Securities and Exchange Act of 1934, proposed by the SEC, that would have established a selective waiver rule regarding documents disclosed to the agency." *Id.* at 1425.

[14] Title 26, United States Code, Section 501(c)(3) affords an organization which meets the criteria set forth in that section a broad exemption from paying income tax. It also permits donors to the organization to take certain tax deductions for amounts contributed to the organization. *See MIT*, 129 F.3d at 682.

After the district court upheld a petition filed by the IRS to obtain the documents, MIT appealed to the First Circuit. Following a review of caselaw from other circuits, the MIT court chose to reject the *Diversified* approach. It held:

> [a]nyone who chooses to disclose a privileged document to a third party, or does so pursuant to a prior agreement or understanding, has an incentive to do so, whether for gain or to avoid disadvantage. It would be perfectly possible to carve out some of those disclosures and say that, although the disclosure itself is not necessary to foster attorney-client communications, neither does it forfeit the privilege. With rare exceptions, courts have been unwilling to start down this path – which has no logical terminus – and we join in this reluctance.

*MIT*, 129 F.3d at 686.

## B. SELECTIVE WAIVER IN ALL SITUATIONS

The selective waiver doctrine stems from the *Diversified* opinion alluded to *seriatim* above. Diversified, a Delaware corporation operating in Missouri, manufactured and processed nonferrous metals. During a proxy fight, it became apparent that Diversified had engaged domestically in the type of activities that Westinghouse and Occidental had engaged in abroad; i.e., it was paying bribes to obtain business. *Diversified*, 572 F.2d at 607. The company formed an independent audit committee, retained outside counsel, and set about preparing an internal report on the issue. Outside counsel then presented the information to the board, which acted on the information contained therein. *Id.* The SEC also obtained a copy of the report in question, apparently through the use of an administrative subpoena. *Id.* at 611.

One of the customers bribed by Diversified brought suit, and sought to obtain the audit report (prepared by Arthur Anderson & Co.), as well as the minutes of the board meeting where outside counsel presented it to Diversified. *Id.* at 596, 601. The district court ordered the production of the documents in question, finding they were not covered by

## DISSENT

BOGGS, Circuit Judge, dissenting. The court's opinion today unnecessarily raises the cost of cooperating with a government investigation. For the court, the existence of a government investigation exception to the third-party waiver rule is an impediment to the truth-seeking process. Op. at 24. After all, under the court's rule *more* participants in the criminal and civil justice systems have access to privileged information, and the courts' task of making accurate factual determinations is eased. Realistically speaking, the choice before this court today is not between narrower and wider disclosure, but between a disclosure only to government officials and *no disclosure at all*. Because I am convinced that a government investigation exception to the third-party waiver rule would increase the information available over that produced by the court's rule and would aid the truth-seeking process, I respectfully dissent.

The court undertakes an exhaustive review of the other federal decisions which have addressed this question. The court's analysis of the extant law is largely accurate. I would make clear, however, that the authority arrayed in favor of the court's rule is not overwhelming. It is true that only one circuit court of appeals has implemented a government investigation exception to the third party waiver rule. *See Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 611 (8th Cir. 1978) (*en banc*). Yet it is equally true that one other circuit court of appeals has expressly contemplated a government investigation exception where, as here, the holder of the privilege information executes a confidentiality agreement with the government before disclosure. *See In re Steinhardt Partners*, 9 F.3d 230, 236 (2d Cir. 1993). One circuit court of appeals has rejected a government investigation exception in the case before it, but was not presented with and did not specifically comment upon cases in which the disclosing party had entered into a confidentiality

in *Hickman*, *supra*, for the work product protections, has little to do with talking to the Government. Even more than attorney-client privilege waiver, waiver of the protections afforded by the work product doctrine is a tactical litigation decision. Attorney and client both know the material in question was prepared in anticipation of litigation; the subsequent decision on whether or not to "show your hand" is quintessential litigation strategy. Like attorney-client privilege, there is no reason to transform the work product doctrine into another "brush on the attorney's palette," used as a sword rather than a shield. *Steinhardt*, 9 F.3d at 235.

Again, like our discussion of the attorney-client privilege above, preserving the traditional confines of the rule affords both an ease of judicial administration as well as a reduction of uncertainty for parties faced with such a decision. These and other reasons "persuade us that the standard for waiving the work-product doctrine should be no more stringent[30] than the standard for waiving the attorney-client privilege" – once the privilege is waived, waiver is complete and final. *Westinghouse*, 951 F.2d at 1429.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the decision of the district court, and **REMAND** for further proceedings consistent with this opinion.

---

[30]This is especially true as to "fact" work product, since it may be obtained even absent waiver by a showing of substantial need and hardship. (footnote added). *See Toledo Edison Co.*, 847 F.2d at 339-40.

attorney-client privilege. A panel opinion of the Eighth Circuit then affirmed that decision. *Id.* at 602-03.

On rehearing en banc, the full Eighth Circuit found that the information in question was covered by the attorney-client privilege. It then turned to the issue of waiver:

> We finally address the issue of whether Diversified waived its attorney-client privilege with respect to the privileged material by voluntarily surrendering it to the SEC pursuant to an agency subpoena. As Diversified disclosed these documents in a separate and nonpublic SEC investigation, we conclude that only a limited waiver of the privilege occurred. *See Bucks County Bank and Trust Co. v. Storck*, 297 F. Supp. 1122 (D. Haw. 1969). *Cf. United States v. Goodman*, 289 F.2d 256, 259 (4th Cir.), *vacated on other grounds*, 368 U.S. 14, 82 S. Ct. 127, 7 L. Ed. 2d 75 (1961). To hold otherwise may have the effect of thwarting the developing procedure of corporations to employ independent outside counsel to investigate and advise them in order to protect stockholders, potential stockholders, and customers.

*Diversified*, 572 F.2d at 611.[15]

---

[15]*Bucks County Bank* pertains to the fact that testimony given in a suppression hearing is not admissible at a subsequent criminal trial. *Bucks County Bank*, 297 F. Supp. at 1123. *Goodman* pertains to the ability to invoke the Fifth Amendment privilege against self-incrimination in a subsequent criminal investigation. *Goodman*, 289 F.2d at 259.

A subsequent Eighth Circuit opinion not referred to by the parties calls into question *Diversified*. In *In re Grand Jury Proceedings Subpoena*, 841 F.2d 230, 234 (8th Cir. 1988) (citing, *inter alia*, *Permian*), the court stated

> [v]oluntary disclosure is inconsistent with the confidential attorney-client relationship and waives the privilege. A claim that a need for confidentiality must be respected in order to facilitate the seeking and rendering of informed legal advice is not consistent with selective disclosure when the claimant decides that the confidential materials can be put to other beneficial purposes.

After this discussion, and a list of supporting cases and other authority,

Following *Diversified*,[16] several district courts held that disclosures to government agencies (typically the SEC in a voluntary disclosure program situation) do not waive the protections of the attorney-client privilege. Citing *Diversified*, the court in *In re Grand Jury Subpoena Dated July 13, 1979*, 478 F. Supp. 368, 373 (D. Wis. 1979), held "I believe that such cooperation [with the SEC] should be encouraged, and therefore I will not treat the release of the Quarles & Brady[17] report to the Securities and Exchange Commission, Internal Revenue Service, or the New York grand jury as a waiver of the corporation's attorney-client privilege with regard to the notes." The Northern District of Texas arrived at a similar conclusion. *See In re LTV Securities Litigation*, 89 F.R.D. 595, 605 (N.D. Tex. 1981) ("LTV's disclosure of the additional materials to the SEC does not justify the class' discovery of the identity of those documents believed by LTV to be most important [i.e., privileged]"). The Southern District of New York, in *Byrnes v. IDS Realty Trust*, 85 F.R.D. 679, 689 (S.D.N.Y. 1980) relied on both *Diversified* and *In re Grand Jury Subpoena Dated July 13, 1979* to find that "voluntary submissions to agencies in separate, private proceedings should be a waiver only as to that proceeding." *See also Enron Corp. v. Borget*, No. 88 CIV. 2828 (DNE), 1990 WL 144879 (S.D.N.Y. Sept. 22, 1990), at * 2 ("the public policy concern of encouraging

---

the court noted "*but cf. Diversified Industries, Inc. v. Meredith*, 572 F.2d 596, 611 (8th Cir. 1977) (banc) [sic] (limited waiver theory)." *In re Grand Jury Proceedings Subpoena*, 841 F.2d at 234.

[16]Of note, the Supreme Court alluded to the *Diversified* opinion several times in *Upjohn Co. v. United States*, 449 U.S. 383, 101 S. Ct. 677, 66 L. Ed. 2d 584 (1981), but only for its definition of the scope of attorney-client privilege.

[17]Quarles and Brady, a Milwaukee, Wisconsin, law firm had performed an audit of the Miller Brewing Company in response to an SEC investigation into questionable "slush fund" payments during the early 1970s. *Id.* at 370-71.

---

outside counsel conducting the investigation may hesitate to pursue unfavorable information or legal theories about the corporation. Thus, allowing a party to preserve the doctrine's protection while disclosing work product to a government agency could actually discourage attorneys from fully preparing their cases.

*Id.* at 1429-30.[28]

The Northern District of California adopted the reasoning employed in *Westinghouse* to reject selective waiver in the work product context. *See In re Worlds of Wonder Securities Litigation*, 147 F.R.D. 208 (N.D. Cal. 1992). Although Worlds of Wonder disclosed information to the SEC pursuant to a confidentiality agreement, the court found that "[w]aiver of work product to the SEC also waives work product to others." *Id.*, at 211 (citing *In re Sealed Case*, 676 F.2d, at 817). It concluded that the company could "not pick and choose to which adversaries [it would] reveal documents." *Id.*, at 212.

Other than the fact that the initial waiver must be to an "adversary,"[29] there is no compelling reason for differentiating waiver of work product from waiver of attorney-client privilege. Many of the reasons for disallowing selective waiver in the attorney-client privilege context also apply to the work product doctrine. The ability to prepare one's case in confidence, which is the chief reason articulated

---

[28]The First Circuit upheld the "prevailing rule that disclosure to an adversary, real or potential, forfeits work product protection." *MIT*, 129 F.3d at 687 (rejecting a selective waiver theory for work product) (citing *Steinhardt*, 9 F.3d, at 234; *Westinghouse*, 951 F.2d at 1428-31; *In Re Subpoena Duces Tecum*, 738 F.2d at 1372). The court noted that waiver of the work product protection differs slightly from waiver of attorney-client privilege in that the original disclosure must be to an "adversary" in order to find initial waiver. *Id.* at n.6 (collecting cases). There is no question that in the instant case DoJ was an "adversary" of Columbia/HCA when the disclosure occurred.

[29]*See supra* note 28.

As noted by the court below, *In re Columbia Healthcare*, 192 F.R.D., at 579-80, the Third Circuit in *Westinghouse* rejected application of selective waiver in the work product arena. The *Westinghouse* court found that "the standard for waiving the work-product doctrine should be no more stringent that the standard for waiving the attorney-client privilege." *Westinghouse*, 951 F.2d at 1429.

> When a party discloses protected materials to a government agency investigating allegations against it, it uses those materials to forestall prosecution (if the charges are unfounded) or to obtain lenient treatment (in the case of well-founded allegations). These objectives,[27] however rational, are foreign to the objectives underlying the work-product doctrine.

*Id.*

*Westinghouse* rejected the argument that under *In re Sealed Case* and *In re Subpoena Duces Tecum* a confidentiality agreement could preserve the work product privilege. While noting that had Westinghouse and the SEC not been adversaries the court "might reach a different result," the Third Circuit found that "because Westinghouse deliberately disclosed work product to two government agencies investigating allegations against it," it could not rely on the confidentiality agreement to salvage work product protections. *Westinghouse*, 951 F.2d at 1431. The court also noted that as a matter of public policy,

> [i]f internal investigations are undertaken with an eye to later disclosing the results to a government agency, the

---

[27]*Westinghouse* found that the work product doctrine "promotes the adversary system by protecting the confidentiality of papers prepared by or on behalf of attorneys in anticipation of litigation. Protecting attorneys' work product promotes the adversary system by enabling attorneys to prepare cases without fear that their work product will be used against their clients." *Westinghouse*, 951 F.2d, at 1428 (citing *Hickman*, 329 U.S., at 510-11, 67 S.Ct., at 393-94; *United States v. AT&T*, 642 F.2d, at 1299)(footnote added).

cooperation with law enforcement militates in favor of a no waiver [of the privilege as to other parties] finding.").

### C.  SOME SELECTIVE WAIVER

The final approach to this issue, adopted by some courts overtly and suggested by others, has its roots in *Teachers Insurance & Annuity Association of America v. Shamrock Broadcasting Co.*, 521 F. Supp. 638 (S.D.N.Y. 1981). As with many of the other cases on this subject, *Teachers Insurance* involved the investigation, during the 1970s, of alleged improper dealings by a corporation. Here, the issue involved a series of questionable loans and other debentures by Shamrock. *Id.* at 640. Using its investigatory subpoena powers, the SEC marshaled numerous documents pertaining to the questionable dealings, and ultimately obtained a consent judgment for securities' law violations. *Id.*

Teachers, as a shareholder of Shamrock, sought to obtain the information disclosed to the SEC. The SEC subpoena expressly stated that the information sought

> was to be used "principally for the purpose of investigating possible violations of the federal securities laws"; and that the information might also be used "[i]n any proceeding where the Federal securities laws are in issue or in which the Commission or past or present members of its staff is a party or otherwise involved in an official capacity."

*Id.* In other words, Shamrock did not enter into any limiting confidentiality agreement with the SEC (nor did it fight the subpoenas on the grounds of privilege when the SEC issued them).

The court reviewed the case law published as of the date of the opinion, including *Diversified*, *In re Grand Jury Subpoena Dated July 13, 1979*, *In re Weiss*, and others, and arrived at the following conclusion: "I am of the opinion that disclosure to the SEC should be deemed to be a complete waiver of the attorney-client privilege *unless* the right to

assert the privilege in subsequent proceedings is specifically reserved at the time the disclosure is made." *Teachers Insurance*, 521 F. Supp. at 644-45 (emphasis added). The court concluded that some case law "suggested" a "third alternative" to the positions in *Diversified* and *In re Weiss*: "no waiver if the documents were produced to the SEC under a protective order, stipulation or other express reservation of the producing party's claim of privilege as to the material disclosed." *Id.*, at 646. The court noted that "[i]t does not appear that such a reservation would be difficult to assert, nor that it would substantially curtail the investigatory ability of the SEC. . . ." *Id.* Such a stipulation would also "make clear that . . . the disclosing party had made some effort to preserve the privacy of the privileged communication, rather than having engaged in abuse of the privilege by first making a knowing decision to waive the rule's protection and then seeking to retract that decision in subsequent litigation." *Id.*[18]

While the *Bowne* opinion (which rejected selective waiver) purported to overrule *Teachers Insurance*, both were followed by the Second Circuit's opinion in *In re Steinhardt Partners, L.P.*, 9 F.3d 230 (2d Cir. 1993). *Steinhardt* involved an SEC investigation into irregularities in the treasuries market. Steinhardt, cooperating with SEC officials, prepared a memorandum and exhibits concerning its involvement in the treasuries market. *Id.* at 232. While the memorandum was marked "FOIA [Freedom of Information Act] Confidential Treatment Requested," no confidentiality agreement was reached with the SEC prior to turning over the materials. The district court granted a motion to compel production of the materials tendered by class action plaintiffs. *Id.*

---

**18***Schnell v. Schnall*, 550 F. Supp. 650 (S.D.N.Y. 1982), which closely followed *Teachers Insurance*, adopted its analysis (as partial support) in finding that a disclosure made to the SEC did not constitute a waiver of attorney-client privilege. *Schnell* also relied on *Diversified* and *Byrnes*.

program came to light, both private plaintiffs and the Government launched lawsuits against Chrysler. *Id.*, at 845. Chrysler undertook to prepare an audit of the program to determine its full extent; i.e., how many cars left Chrysler facilities under these circumstances, which employees drove the cars, etc. Chrysler then provided the analysis to counsel for a class action group pursuant to a confidentiality agreement, but refused to turn it over to the Government. *Id.*[26]

After declining to determine whether or not the analysis constituted "ordinary" or "opinion" work product, the court concluded "that Chrysler waived any work product protection by voluntarily disclosing the computer tape to its adversaries, the class action plaintiffs, during the due diligence phase of the settlement negotiations." *Id.* at 846. The court continued "[d]isclosure to an adversary waives the work product protection as to items actually disclosed, even where disclosure occurs in settlement." *Id.* (quoting *Grumman Aerospace Corp. v. Titanium Metals Corp. of America*, 91 F.R.D. 84, 90 (E.D.N.Y. 1981); and *Chubb Integrated Systems Ltd. v. National Bank*, 103 F.R.D. 52, 67 (D.D.C. 1984)). The court discounted the confidentiality agreement, finding that

> [n]or does the agreement between Chrysler and co-liaison counsel for the class action plaintiffs not to disclose the computer tape to third-parties change the fact that the computer tape has not been kept confidential. "Confidentiality is the dispositive factor in deciding whether material is privileged."

*Id.* at 847 (quoting *Chubb*, 103 F.R.D. at 67).

---

**26**Thus, this case notably differs from the instant dispute in that the policy considerations undergirding selective waiver in favor of the Government were not present. However, as noted previously, several of the same policy considerations apply to private litigants, especially in the type of situation presented by the *Chrysler* dispute.

("We conclude, then, that while the mere showing of a voluntary disclosure to a third person will generally suffice to show waiver of the attorney-client privilege, it should not suffice in itself for waiver of the work product privilege."(footnote omitted) (quoting *United States v. AT&T*, 642 F.2d 1285, 1299 (D.C. Cir. 1980))). As noted previously, the "work product doctrine is distinct from and broader than the attorney-client privilege" and extends beyond confidential communications between the attorney and client to "any document prepared in anticipation of litigation by or for the attorney." *In re Antitrust Grand Jury*, 805 F.2d at 163 (internal quotation and citations omitted). Indeed, in *Permian*, which so roundly rejected selective waiver as to attorney-client privilege, the D.C. Circuit upheld a finding by the district court that the agreement between Occidental and the SEC preserved the work product protection. *Permian*, 665 F.2d at 1215.[25] *See also Steinhardt*, 9 F.3d at 236 (discussing the ability of using an agreement with the SEC to protect work product and attorney-client privilege); *In re Subpoena Duces Tecum*, 738 F.2d at 1375 (finding that the party waives work product unless it insists "on a promise of confidentiality before disclosure to the SEC."(citing *In re Sealed Case*, 676 F.2d at 823)).

However, other circuits have been more willing to recognize waiver of the work product doctrine. The Eighth Circuit, which so strongly protected attorney-client privilege in *Diversified*, easily found waiver of the work product doctrine. *See In re Chrysler Motors Corp. Overnight Evaluation Program Litigation*, 860 F.2d 844 (8th Cir. 1988). Chrysler established a "quality control" program whereby workers disconnected the odometers on new cars and then took the cars home overnight for a "test drive." When the

---

*Shields v. Sturm, Ruger & Co.*, 864 F.2d 379, 382 (5th Cir. 1989)).

[25]The *In re Martin Marietta* court, which also rejected selective waiver for attorney-client privilege, similarly found that work product privilege had been maintained (but only as to opinion work product). *In re Martin Marietta*, 856 F.2d at 626-27.

---

On appeal, Steinhardt raised the issue of selective waiver. Making no mention of *In re John Doe Corp.*,[19] the court noted "[t]he circuits have . . . split on this issue [of selective waiver]." *Steinhardt*, 9 F.3d at 233 (citing *Westinghouse*, *In re Subpoena Duces Tecum*, and *Diversified*). After evaluating the case law, the court concluded "[w]e agree that selective assertion of privilege should not be merely another brush on an attorney's palette, utilized and manipulated to gain tactical or strategic advantage." *Id.* at 235 (discussing work product) (citing *Permian*, 665 F.2d at 1221). Nonetheless, the court "decline[d] to adopt a *per se* rule that all voluntary disclosures to the government" waives the protection of privilege. *Id.* at 236.

> Establishing a rigid rule would fail to anticipate situations in which the disclosing party and the government may share a common interest in developing legal theories and analyzing information, or situations in which the SEC and the disclosing party have entered into an explicit agreement that the SEC will maintain the confidentiality of the disclosed materials.

*Id.* (citing *In re Sealed Case*, 676 F.2d 793, 817 (D.C. Cir. 1982); *In re LTV*, 89 F.R.D. at 614-15).

Following the decision in *Steinhardt*, the Southern District of New York returned to the approach set out in *Teachers Insurance*. The *In re Leslie Fay Companies, Inc. Securities Litigation* opinion involved disclosures of an audit report to the Office of the United States Attorney (as well as certain other individuals related to the ongoing audit). *In re Leslie Fay Companies, Inc. Securities Litigation*, 161 F.R.D. 274, 284 (S.D.N.Y. 1995). When the disclosures occurred, they

---

[19]Recently, the Second Circuit has returned again to *In re John Doe Corp.* for the proposition that "where a corporation has disseminated information to the public that reveals parts of privileged communications or relies on privileged reports, courts have found the privilege waived." *In re Grand Jury Proceedings*, 219 F.3d 175, 184 (2d Cir. 2000) (citing, *inter alia*, *In re John Doe Corp.*, 675 F.2d at 488-89).

"were made pursuant to confidentiality agreements intended to preserve any privilege applicable to the disclosed documents." *Id.* The agreements provided that "production of these documents 'shall not be deemed to be a breach of any available attorney/client or work product privilege.'" *Id.* (citation omitted). The Court noted that in "*Steinhardt*, the Second Circuit indicated that the disclosure of privileged information to the government may not constitute a waiver if the government agrees to maintain the confidentiality of the disclosed materials. We think that the [confidentiality] agreement satisfies the standard articulated in *Steinhardt*." *Id.* (footnote omitted)(citing *Steinhardt*, 9 F.3d at 236).

Two other circuit court opinions left the door open to selective waiver conditioned on the presence of a confidentiality agreement. In *Dellwood Farms, Inc. v. Cargill, Inc.*, 128 F.3d 1122 (7th Cir. 1997), Chief Judge Posner indicated that rejection of selective waiver stemmed, in part, from the courts' opinion "that the possessor of the privileged information should have been more careful, as by obtaining an agreement by the person to whom they made the disclosure not to spread it further." *Id.* at 1127 (citation omitted). The First Circuit, in *United States v. Billmyer*, 57 F.3d 31 (1st Cir. 1995), provided the following discussion:

> [i]f there were ever an argument for limited waiver, it might well depend importantly on just what had been disclosed to the government *and on what understandings*. Without intending to preclude such an argument in a future case, we think that it is enough in this one to say that no such claim of limited waiver has been argued to us.

*Id.* at 37 (emphasis added).[20]

Finally, the District of Colorado adopted the *Teachers Insurance* approach as "a compromise position." *In re M&L Business Machine Company, Inc.*, 161 B.R. 689, 695 (D. Col.

---

[20]Of course, this opinion precedes *MIT* (discussed *supra*).

general principle that disclosure normally negates the privilege is worth maintaining. To maintain it here makes the law more predicable and certainly eases its administration. Following the Eighth Circuit's approach would require, at the very least, a new set of difficult line-drawing exercises that would consume time and increase uncertainty.

*MIT*, 129 F.3d at 685. Just as the attorney-client privilege itself provides certainty to litigants that information relayed to one's attorney will not be disclosed, rejection of selective waiver provides further certainty that waiver of the privilege ensures that the information will be disclosed.[23]

## II. WORK PRODUCT

"Even if [Columbia/HCA] is deemed to have waived the attorney-client privilege [], this does not necessarily mean that [Columbia/HCA] also has waived work product immunity." *Picard Chemical Inc. Profit Sharing Plan v. Perrigo Co.*, 951 F. Supp. 679, 689 (W.D. Mich. 1996) (citing *In re Grand Jury*, 106 F.R.D. 255, 257 (D.N.H. 1985); and *Handgards*, 413 F. Supp. at 929).[24] *See also Permian*, 665 F.2d at 1219

---

[23]The application of this "bright line" rule in the instant case does not unduly or unexpectedly thwart the expectations of Columbia/HCA. Its counsel admitted during oral arguments that the company knew the unsettled nature of the law, and arrived at the decision to enter into the agreement with the Government after contemplating the possibility the agreement would not protect its confidential information.

[24]There is no dispute that a party may waive the protections of the work product privilege, as this Circuit has recognized. *See Ginett v. Federal Express Corp.*, 166 F.3d 1213 (table), 1998 WL 777998 (6th Cir. Oct. 21, 1998), at *10 n.7 (citing *Carter v. Gibbs*, 909 F.2d 1450 (Fed. Cir. 1990)). *See also Nobles*, 422 U.S. at 239, 95 S. Ct. at 2170 (the work product doctrine is "[l]ike other qualified privileges, [it] may be waived.").

The district court in *Picard Chemical* held that the disclosure of work product in one case by order of a court, where the party had undertaken considerable efforts to protect the disclosure, did not waive the privilege "before another court." *Picard Chemical*, 951 F. Supp. at 689 (quoting

waiver would improve the ability of the Government and private parties to settle certain actions.

However, this argument has several flaws. As noted by the First Circuit, it "has no logical terminus." *MIT*, 129 F.3d at 686. Insofar as the "truth-finding process" is concerned, a private litigant stands in nearly the same stead as the Government. This argument holds considerable weight in the numerous circumstances whereby litigants act as private attorneys general, and through their actions vindicate the public interest. A plaintiff in a shareholder derivative action or a qui tam action who exposes accounting and tax fraud provides as much service to the "truth finding process" as an SEC investigator. Recognizing this, a difficult and fretful linedrawing process begins, consuming immeasurable private and judicial resources in a vain attempt to distinguish one private litigant from the next.

A countervailing policy concern, heretofore not discussed, is whether the Government should assist in obfuscating the "truth-finding process" by entering into such confidentiality agreements at all. The investigatory agencies of the Government should act to bring to light illegal activities, not to assist wrongdoers in concealing the information from the public domain. Governmental agencies "have means to secure the information they need" other than through voluntary cooperation achieved via selective waiver (albeit at a higher cost in time and money). *MIT*, 129 F.3d at 685. It is not necessary for the courts to create a new method, one which effectively prevents future litigants from obtaining the same information, when other means (means which will not result in the information being concealed from the public) are available to the Government.

The decision to enter into settlement negotiations, and to disclose otherwise confidential information in the process, is a tactical one made by the client and his or her attorney. All litigation-related tactical decisions have an upside and a downside. By refusing the doctrine of selective waiver, the Court agrees with the First Circuit that the

1993). *M&L Business Machine* pertained to an agreement between a bank and the Office of the United States Attorney investigating the bankruptcy of M&L. The bank agreed to give the U.S. Attorney certain information, provided the information would be held in confidence by the U.S. Attorney and the grand jury. *Id.* at 691. Subsequently, the bankruptcy trustee attempted to obtain the same information pursuant to a subpoena. The bank filed a motion to quash, arguing (in part) that only a selective waiver as to attorney-client privilege occurred. *Id.* at 693.

The court found that "the *Teachers Insurance* view strives to balance the policy goal of encouraging cooperation with the government noted in [*Diversified*] with the strict requirement of confidentiality held paramount in *Permian*." *Id.* (citing *Fox v. California Sierra Financial Services*, 120 F.R.D. 520, 526 (N.D. Cal. 1988)).[21] The court noted not only the steps taken to ensure confidentiality, but also the fact that by disclosing the information to the U.S. Attorney, the bank was not doing so "for the purpose of obtaining some benefit for itself." *Id.* at 696. The court found this distinguished the *M&L Business Machine* case from the numerous cases involving the SEC's voluntary disclosure program (where disclosure was predicated on the hope of obtaining favorable treatment from the SEC). *Id.*

### D.  CONCLUSION

As pointed out by Columbia/HCA, this Court recently alluded to the *Diversified* opinion, stating "[t]hough we need not decide whether we would approve of 'selective' waiver in

---

[21]*Fox* adopted the *Teachers Insurance* approach explicitly. *Fox*, 120 F.R.D. at 526 ("I find that where, as here, information has been voluntarily and selectively disclosed to the SEC without attempts to protect the privileged nature of such information, fairness requires a finding that the attorney-client privilege has been waived as to the disclosed information and all information on the same subject."(citing *Weil v. Investment/Indicators, Research and Management*, 647 F.2d 18, 24 (9th Cir. 1981); *Teachers Insurance*; and *Handgards v. Johnson & Johnson*, 413 F. Supp. 926, 929 (N.D. Cal. 1976))).

this case, we believe that some of the interests considered in *Diversified Indus.* are similar to those in the instant case." *In re Perrigo Co.*, 128 F.3d 430, 441 (6th Cir. 1997). However, after due consideration, we reject the concept of selective waiver, in any of its various forms.

First, the uninhibited approach adopted out of wholecloth[22] by the *Diversified* court has little, if any, relation to fostering frank communication between a client and his or her attorney. As pointed out by the Third Circuit in *Westinghouse*, the *Diversified* approach "merely encourages voluntary disclosure to government agencies." *Westinghouse*, 951 F.2d at 1425. The attorney-client privilege was never designed to protect conversations between a client and the Government – i.e., an adverse party – rather, it pertains only to conversations between the client and *his or her* attorney. In *Upjohn*, the Supreme Court recognized that the

> purpose [of attorney-client privilege] is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice. The privilege . . . rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out. [The] purpose of the privilege [is] to encourage clients to make full disclosure to their attorneys.

*Upjohn*, 449 U.S. at 389, 101 S. Ct. at 682. Nowhere amongst these reasons is the ability to "talk candidly with the Government."

Secondly, any form of selective waiver, even that which stems from a confidentiality agreement, transforms the attorney-client privilege into "merely another brush on an

---

[22]As indicated in note 15, *supra*, the two cases relied upon by the Eighth Circuit in *Diversified* pertain to the protections of the Fifth Amendment, not attorney-client privilege.

attorney's palette, utilized and manipulated to gain tactical or strategic advantage." *Steinhardt*, 9 F.3d 235. Once "the privacy for the sake of which the privilege was created [is] gone by the [client's] own consent, . . . the privilege does not remain in such circumstances for the mere sake of giving the client an additional weapon to use or not at his choice." *Green v. Crapo*, 181 Mass 55, 62, 62 N.E. 956, 959 (1902) (Holmes, J.). "The client cannot be permitted to pick and choose among his opponents, waiving the privilege for some and resurrecting the claim of confidentiality as to others, or to invoke the privilege as to communications whose confidentiality he has already compromised for his own benefit." *Permian*, 665 F.2d at 1221.

Moreover, attorney-client privilege is a matter of common law right, "the oldest of the privileges for confidential communications known to the common law." *Upjohn*, 449 U.S. at 389, 101 S. Ct. at 682. It is not a creature of contract, arranged between parties to suit the whim of the moment. While the approach advocated by *Teachers Insurance* certainly protects the expectations of the parties to the confidentiality agreement, it does little to serve the "public ends" of adequate legal representation that the attorney-client privilege is designed to protect. *Id.*

There is considerable appeal, and justification, for permitting selective waiver when the initial disclosure is to an investigating arm of the Government. Undoubtedly, by waiving privilege as to the Government, a client furthers the "truth-finding process." *Permian*, 665 F.2d at 1221. Considerable savings are realized to the Government, and through it to the public, in time and fiscal expenditure related to the investigation of crimes and civil fraud. Such a policy might also, like the SEC voluntary disclosure policy, increase the likelihood that corporations would engage in the type of self-policing represented by the Coding Audits. Without a doubt, disclosure of information to the Government in a cooperative manner encourages settlement of disputes and by encouraging cooperative exchange of information, selective