In re: LUPRON® MARKETING AND SALES PRACTICES LITIGATION

No. MDL 1430

No. 01–CV–10861–RGS.

United States District Court, D. Massachusetts.

April 16, 2004.

Anita B. Bapooji, Deborah S. Birnbach, Monica Meier Franceschini, Joseph F. Savage, Jr., Matthew A. Wolfman, Testa, Hurwitz & Thibeault, LLP, Boston, MA, for TAP Pharmaceutical Products, Inc., Defendant.

Daniel A. Curto, Donald R. Frederico, McDermott, Will & Emery, Boston, MA, for Abbott Laboratories, Defendant.

Michael J. Flannery, The David Danis Law Firm, P.C., St. Louis, MO, Jeffrey L. Kodroff, Spector & Roseman, Philadelphia, PA, Thomas G. Shapiro, Shapiro, Haber & Urmy, LLP, Boston, MA, Thomas M. Sobol, Hagens Berman, Boston, MA, for William M. Porter, Plaintiff.

Martin F. Murphy, Rheba Rutkowski, Fiona S. Trevelyan Bingham, Bingham McCutchen LLP, Boston, MA, for Takeda Chemical Industries, Defendant.

*MEMORANDUM AND ORDER ON DEFENDANT TAP PHARMACEUTICAL PRODUCTS INC.'S MOTION FOR CERTIFICATION OF ORDER COMPELLING DISCLOSURE OF ATTORNEY–CLIENT PRIVILEGED AND WORK PRODUCT MATERIALS FOR IMMEDIATE APPELLATE REVIEW*

STEARNS, District Judge.

Defendant TAP Pharmaceutical Products, Inc. (TAP), aggrieved by the court's Order of March 17, 2004, requiring the production of material for which it had claimed attorney-client privilege and work product protection, seeks certification of the Order for immediate appellate review

pursuant to 28 U.S.C. § 1292(b). By way of background, in the late 1990's, TAP came under intense government scrutiny for the manner in which it had priced its proprietary drug Lupron®. On October 16, 2001, pursuant to a global settlement with the federal government, TAP plead guilty to violating the Prescription Drug Marketing Act, 21 U.S.C. §§ 331(t), 333(b), and paid a criminal fine of $290 million and $585 million in civil restitution. As part of the settlement, TAP and its outside counsel, the firms of Hogan & Hartson and Reed Smith, agreed to produce material to the government that had been withheld under claims of work product protection and attorney-client privilege. Prior to production, TAP received a letter from government prosecutors promising to treat the material as if protected by grand jury Rule 6(e).[1]

Interlocutory certification under 28 U.S.C. § 1292(b) is appropriate when an "order [1] involves a controlling question of law [2] as to which there is substantial ground for difference of opinion and [3] that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b).[2] A controlling question of law,

as TAP states, is one that is " 'serious to the conduct of the litigation, either practically or legally.' " *Johnson v. Burken*, 930 F.2d 1202, 1206 (7th Cir.1991), quoting *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 755 (3d Cir.1974). There can be no question but that the court's determination that TAP had as a matter of law waived attorney-client privilege and work product protection by producing privileged material to the government is "serious to the conduct of the litigation." Where TAP's request founders is on the second leg of the § 1292(b) test, whether the court's decision presents a "substantial ground for difference of opinion." [3]

As the court stated in the March 17 Order, it considered the "limited waiver rule" issue [4] settled in this Circuit by *United States v. Massachusetts Institute of Technology*, 129 F.3d 681 (1st Cir.1997) (*MIT*).[5] In *MIT*, the University made disclosures to the Defense Contract Audit Agency (DCAA), a potential adversary, and then objected when some or all of the same documents were sought by the Internal Revenue Service (IRS). In rejecting the University's claim of a selective waiver of the attorney-client privilege, the First Circuit observed that the law had carved

1. Rule 6(e) does not provide for absolute confidentiality. Grand jury matters may be disclosed by order of the court in a variety of circumstances, by attorneys for the government in connection with the performance of their law enforcement duties or pursuant to the provisions of the USA PATRIOT ACT, or by grand jury witnesses (who are not bound by any obligation of secrecy).

2. Interlocutory certification under § 1292(b) is to be undertaken "sparingly and only in exceptional circumstances." *In re San Juan Dupont Plaza Hotel Fire Litig.*, 859 F.2d 1007, 1010 n. 1 (1st Cir.1988).

3. Given the disposition of the motion on the second leg of the test, there is no need to reach the third leg, although I frankly do not understand TAP's argument that an interlocutory appeal will hasten the termination of the

litigation by permitting the "parties to clearly evaluate their positions without the prospect of future litigation uncertainty as to this issue." Intuitively, I would think plaintiffs' position that an appeal would only delay the litigation is more accurate.

4. Judge Becker notes that the correct term is "selective waiver," as the concept of "limited waiver" encompasses both selective and partial waivers. *See Westinghouse Electric Corp. v. Republic of the Philippines*, 951 F.2d 1414, 1423 n. 7 (3d Cir.1991). I will adopt Judge Becker's nomenclature.

5. While it is true that in *United States v. Billmyer*, 57 F.3d 31, 37 (1st Cir.1995), the Court described the issue as open, that is no longer the case after *MIT*.

out only a small "magic circle" of others with whom information may be shared without the loss of the privilege, specifically those persons who are necessary to facilitate the consultation between lawyer and client, such as secretaries, interpreters and counsel for co-defendants, and persons closely related to the client whose presence is appropriate, if perhaps not vital. But, "where the client chooses to share communications outside this magic circle, the courts have usually refused to extend the privilege." *Id.* at 684.

In attempting to distance itself from the *MIT* case, TAP makes three arguments: (1) that it had explicit assurances from the government that the materials would be treated as confidential; (2) that public policy considerations favor voluntary cooperation by potential government enforcement targets to "enhanc[e] the government's ability to conduct expeditious investigations and, where appropriate, to obtain prompt relief"; and (3) that *MIT* is distinguished by the fact that the secondary disclosure was to another government agency rather than to a private litigant. The first two arguments were considered and rejected in *MIT*.

The *MIT* Court addressed the reliance argument by observing that the University's production of the disputed documents, whatever sense of security it might have derived from the DCAA's confidentiality

regulations, was nonetheless a calculated risk in light of (then) five Circuit Court opinions holding that a disclosure of privileged material to a government agency, no matter what the attendant circumstances, destroyed the privilege.

> MIT may have had some reason to think that the audit agency would not disclose the documents to the IRS (and the agency did not do so). But MIT had far less reason to think that it could disclose documents to the audit agency and still maintain the privilege when IRS then sought the same documents..... The choice to disclose may have been reasonable but it was still a foreseeable gamble.

*Id.* at 686.[6] Among the cases referenced by Judge Boudin in *MIT* was Judge Becker's opinion in *Westinghouse*. There the disclosing client relied not only on SEC confidentiality regulations but also on a stipulated court order memorializing a secrecy agreement that it had reached with the Department of Justice (DOJ). 951 F.2d at 1426. As Judge Becker stated in rejecting the reliance argument, "[e]ven though the DOJ apparently agreed not to disclose the information, under traditional waiver doctrine a voluntary disclosure to a third party waives the attorney-client privilege even if the third party agrees not to disclose the communications to anyone else." *Id.*, at 1427.[7]

---

6. The issue here, it must be stressed, is not whether the government can be compelled to disclose material that it has received under a confidentiality agreement. The issue is whether TAP's voluntary disclosure of privileged material to the government resulted in a waiver of the protections of the privilege as to third parties.

7. TAP does not argue that its disclosures were involuntary in any legally meaningful sense. While it is true, as TAP points out, that the Second Circuit intimated that it might make an exception for an explicit confidentiality agreement between a government agency and

a disclosing party, it did so in the context of a discussion of the less easily waived work product rule and not attorney-client privilege. *See In re Steinhardt Partners, L.P.*, 9 F.3d 230, 236 (2d Cir.1993). The Seventh Circuit, while rejecting the selective waiver rule, is ambiguous on the point of confidentiality agreements. *See Dellwood Farms, Inc. v. Cargill, Inc.*, 128 F.3d 1122, 1126–1127 (7th Cir. 1997) (Posner, C.J.). *Compare Burden–Meeks v. Welch*, 319 F.3d 897, 899 (7th Cir.2003) ("Knowing disclosure to a third party almost invariably surrenders the privilege with respect to the world at large; selective disclosure is not an option.") (Easterbrook, J.).

TAP's policy argument in defense of the governmental interest in voluntary cooperation has been made in virtually every case in which the selective waiver issue has arisen. In *MIT*, the First Circuit, like other Circuits before it, rejected the argument as lying outside any area of judicial concern or competence.[8]

> We put to one side the interest of the government agency in obtaining voluntary disclosures; such agencies usually have means to secure the information they need and, if not, can seek legislation from Congress. By contrast, the safeguarding of the attorney-client relationship has largely been left to the courts, which have a comparative advantage in assessing consequences in this sphere.

*Id.* at 685.[9] Again, Judge Becker made a similar point in *Westinghouse.*

> Westinghouse argues that the selective waiver rule encourages corporations to conduct internal investigations and to cooperate with federal investigative agencies. We agree with the D.C. Circuit that these objectives, however laudable, are beyond the intended purposes of the attorney-client privilege, *see Permian*, 665 F.2d at 1221, and therefore we find Westinghouse's policy arguments irrelevant to our task of applying the attorney-client privilege to this case. In our view, to go beyond the policies underlying the attorney-client privilege

on the rationale offered by Westinghouse would be to create an entirely new privilege.

*Westinghouse*, 951 F.2d at 1425.

Finally, that the disclosure in *MIT* was to a second government agency rather than to a private party is of no consequence for two reasons. First, it is doubtful that the IRS in the *MIT* case could have been bound by any assurances of confidentiality offered by a cognate government agency. Second, and more to the point, this difference is simply the selective waiver doctrine in the guise of a distinction. The issue is not whether any specific party should be made the beneficiary of the selective waiver rule, but whether the rule should be recognized at all. A strong argument against recognition involves the difficulties inherent in any linedrawing.

> Anyone who chooses to disclose a privileged document to a third party, or does so pursuant to a prior agreement or understanding, has an incentive to do so, whether for gain or to avoid disadvantage. It would be perfectly possible to carve out some of those disclosures and say that, although the disclosure itself is not necessary to foster attorney-client communications, neither does it forfeit the privilege. With rare exceptions, courts have been unwilling to start down this path—which has no logical terminus—and we join in this reluctance.

---

**8.** TAP persistently mischaracterizes the court's March 17 memorandum as "acknowledg[ing] in its ruling [that] the circuits are split on the public policy implications of the issue." The court said no such thing. It merely noted that "the public policy stakes can be argued both ways," without suggesting any division on the issue among the Courts of Appeals.

**9.** Nor have the Courts of Appeals reported evidence that a refusal to recognize the selective waiver rule has impeded voluntary cooperation with government investigations. *See,*

*e.g., In re Steinhardt Partners, L.P.,* 9 F.3d at 236 ("The SEC's amicus brief argues convincingly that the protection of privilege is not required to encourage compliance with SEC requests for cooperation with investigations.... The SEC has continued to receive voluntary cooperation from subjects of investigations, notwithstanding the rejection of the selective waiver doctrine by two circuits and public statements from Directors of the Enforcement Division that the SEC considers voluntary disclosures to be discoverable and admissible.").

*MIT,* 129 F.3d at 686. Moreover, if the law were to make exceptions, it is not clear why it would prefer the government, with its arsenal of coercive means, over private litigants who come to the battle virtually unarmed. As the Sixth Circuit observed in weighing the argument,

> [i]nsofar as the "truth-finding process" is concerned, a private litigant stands in nearly the same stead as the Government. This argument holds considerable weight in the numerous circumstances whereby litigants act as private attorneys general, and through their actions vindicate the public interest. A plaintiff in a shareholder derivative action or a qui tam action who exposes accounting and tax fraud provides as much service to the "truth finding process" as an SEC investigator. Recognizing this, a difficult and fretful linedrawing process begins, consuming immeasurable private and judicial resources in a vain attempt to distinguish one private litigant from the next.

A countervailing policy concern, heretofore not discussed, is whether the Government should assist in obfuscating the "truth-finding process" by entering into such confidentiality agreements at all. The investigatory agencies of the Government should act to bring to light illegal activities, not to assist wrongdoers in concealing the information from the public domain. Governmental agencies "have means to secure the information they need" other than through voluntary cooperation achieved via selective waiver (albeit at a higher cost in time and money). *MIT,* 129 F.3d at 685. It is not necessary for the courts to create a new method, one which effectively prevents future litigants from obtaining the same information, when other means (means which will not result in the information being concealed from the public) are available to the Government.

*In re Columbia/HCA Healthcare Corp. Billing Pracitces Litig.,* 293 F.3d 289, 303 (6th Cir.2002). *See also In re Steinhardt Partners, L.P.,* 9 F.3d at 236 (finding that a corporation's voluntary cooperation with an SEC investigation resulted in a waiver of work product protection with respect to private litigants); *Westinghouse,* 951 F.2d at 1427 (same, attorney-client privilege and work product protection).

■ All of this might be besides the point if there were, as TAP suggests, a blazing split among the Circuits as to the proper answer to the question. *Rodriguez v. Banco Central,* 917 F.2d 664, 665 (1st Cir.1990). Despite TAP's best efforts, it is simply unable to manufacture one. As the Court of Appeals in *MIT* observed, every Circuit but the Eighth that has addressed the issue has ruled that voluntary disclosures to the government in an enforcement context destroy the attorney-client privilege. *MIT,* 129 F.3d at 685. *See In re Columbia/HCA Healthcare Corp. Billing Practices Litig.,* 293 F.3d 289, 304 (6th Cir.2002); *Genentech, Inc. v. United States Internat'l Trade Comm'n,* 122 F.3d 1409, 1417 (Fed.Cir.1997); *In re Steinhardt Partners, L.P.,* 9 F.3d 230, 235 (2d Cir.1993); *Westinghouse Elec. Corp. v. Republic of the Philippines,* 951 F.2d 1414, 1424–1426 (3d Cir.1991); *In re Martin Marietta Corp.,* 856 F.2d 619, 623–624 (4th Cir.1988); *Permian Corp. v. United States,* 665 F.2d 1214, 1221 (D.C.Cir.1981). TAP consequently is left with the seely support of a "celebrated and controversial" twenty-five year old opinion, *Diversified Indus. v. Meredith,* 572 F.2d 596, 611 (8th Cir.1977) (en banc), bringing forth a doctrine which, as the First Circuit observed in *MIT,* 129 F.3d at 685, has but a paragraph of analysis as its birthright, no Circuit siblings, and moreover, is probably an orphan in its own home. *See Chrysler Motors Corp. Overnight Evaluation Pro-*

*gram Litig.*, 860 F.2d 844, 846–847(8th Cir. 1988).[10]

### ORDER

For the foregoing reasons, the motion to certify is *DENIED*. The court recognizes that it is open to TAP to seek review of this Order by way of writ of mandamus. Consequently, the court will continue the stay of the production of the disputed documents pursuant to its March 17 Order for twenty-one (21) days to permit TAP to seek relief, if such should be granted, from the Court of Appeals. TAP's companion motion to stay production pending the completion of appellate review is necessarily *DENIED*.

SO ORDERED.

---

**10.** The materials at issue are covered by claims of attorney-client privilege and work product protection. As the First Circuit pointed out in *MIT*, "the cases approach uniformity in implying that work-product protection is not as easily waived as the attorney-client privilege. The privilege, it is said, is designed to protect confidentiality, so that any disclosure outside the magic circle is inconsistent with the privilege; by contrast, work product protection is provided against 'adversaries,' so only disclosing material in a way inconsistent with keeping it from an adversary waives work product protection. At least five circuits have adopted this rule in some form.... In all events, it would take better reason than we have to depart from the prevailing rule that disclosure to an adversary, real or potential, forfeits work product protection." 129 F.3d at 687. As there is no question that the government was an "adversary" of TAP when the disclosure occurred, TAP appropriately does not attempt to distinguish between the two categories of materials in making its selective waiver argument.