In re SYNCOR ERISA LITIGATION.

No. CV–03–2446–RGKRCX.

United States District Court,
C.D. California.

July 6, 2005.

T. David Copley, Keller Rohrback, Seattle, WA, Edward W. Chang, Schiffrin & Barroway, Radnor, PA, for plaintiffs.

Daniel S. Floyd, Benjamin L. Zazove, Michael M. Farhang, Gibson, Dunn & Crutcher, Gordon A. Greenberg, Chris C. Scheithauer, McDermott Will & Emery, Los Angeles, CA, for defendants.

**PROCEEDINGS: (1) ORDER GRANTING PLAINTIFFS' MOTION TO COMPEL ITEMS ON DEFENDANT SYNCOR INTERNATIONAL'S PRIVILEGE LOG; AND (2) ORDER DENYING PLAINTIFF'S MOTION TO COMPEL PRIVILEGE LOG FROM DEFENDANT MONTY FU**

CHAPMAN, United States Magistrate Judge.

On May 24, 2005, plaintiffs filed a notice of motion and motion to compel defendant Syncor International to produce certain items withheld as privileged, a joint stipulation, and the supporting declaration of T. David Copley, with exhibits, and on June 8, 2005, the parties filed supplemental memoranda. On June 1, 2005, plaintiffs filed a notice of motion and motion to compel defendant Monty Fu to produce a privilege log and a joint stipulation and exhibits, and on June 8, 2005, plaintiffs filed a supplemental memorandum.

These motions were heard by Magistrate Judge Rosalyn M. Chapman on July 6, 2005. T. David Copley, attorney-at-law with the firm Keller Rohrback, and Edward W. Chang, attorney-at-law with the firm Schiffrin & Barroway, represented plaintiffs; Daniel S. Floyd, Benjamin L. Zazove and Michael M. Farhang, attorneys-at-law with the firm Gibson, Dunn & Crutcher, represented defendants Syncor International and Robert G. Funari; and Gordon A. Greenberg and Chris C. Scheithauer, attorneys-at-law with the firm McDermott Will & Emery, represented defendant Monty Fu. No parties were present.

## BACKGROUND

### I

The factual allegations of this class action and its procedural posture are, as follows: Syncor International ("Syncor") was a health care services company. [FN1] Syn-

cor sponsored, administrated and was the fiduciary of the Syncor Employees' Savings and Stock Ownership Plan (the "Plan"). The Plan is a 401(k) plan which permits participants to save for retirement and it is a plan under the Employee Retirement Income Security Act ("ERISA"). The Plan also includes an employee stock ownership plan ("ESOP") which invests primarily in the common stock of the company.

FN1. Cardinal Health, Inc., acquired or merged with Syncor on January 1, 2003. Syncor's Board of Directors ("Board") had final decision-making authority regarding all aspects of plan administration. The Board members included: Monty Fu, Syncor's co-founder and chairman of the Board; Robert Funari, Syncor's chief executive officer, president, and Board member; George Oki; Benard Puckett; Ronald Williams; Steven Gerber; Arnold Spangler; and Gail Wilensky. The Board appointed a separate committee ("Plan committee") to oversee the Plan's operation and carry out certain delegated Plan administrative duties. [¶] There were three separate parts of the Plan. First, the Plan permitted participants to contribute between one and 14 percent of their compensation to the Plan each pay period in a "Fund Deferral Account." Participants could invest in any of nine available investment funds chosen by Syncor. Second, participants could invest up to an additional two percent of pre-tax contributions in the Syncor Stock Deferral Account. This account was used to purchase Syncor Common Stock. Third, Syncor established accounts in which Syncor made employer contributions in the form of Syncor stock. These contributions were made in the "Stock Investment Company Account." [¶] During the purported class period, Syncor stock constituted between 66 and 77 percent of the Plan's assets. [¶] On June 14, 2002, Syncor and Cardinal Health, Inc. ("Cardinal") announced that Cardinal would acquire Syncor in a stock-for-stock merger valued at approximately $1.1 billion. Cardinal announced on November 6, 2002, that it had uncovered illegal payments made by Syncor in Taiwan and China. Upon disclosure of the payments, the price of Syncor stock plummeted. By November 8, 2002, the stock had hit a 52–week low, and devalued more than 50 percent in just two trading days. The plummeting share values created losses to the Plan, which was heavily weighted in Syncor stock. As a result of the allegations, Cardinal reduced the exchange rate of 0.52 shares of Cardinal stock for each Syncor share to 0.47. This reduced the consideration to be paid to Syncor shareholders by at least $63 million. [¶] The plaintiffs in this case were employed at Syncor between July 26, 2000 and January 1, 2003 (the "class period") and participated in the Plan.... [¶] ... Two causes of action remain.... The first, against Syncor only, is for breach of fiduciary duty for failure to prudently and loyally manage Plan assets under ERISA sections 404(a)(1)(A)—(D) and 405, 29 U.S.C. §§ 1104(a)(1)(A)—(D) and 1105. The second, against both Syncor and the Director Defendants, [defendants Fu and Funari], is for failure to monitor the Plan committee members and provide them with accurate information under ERISA sections 404(a)(1)(A)—(D) and 405.[¶] The first cause of action involves Plaintiffs' allegation that Syncor stock was an imprudent investment because throughout the class period Syncor was engaging in an illegal foreign bribery scheme in order to increase overseas sales of its radiopharmaceutical services. ... Plaintiffs contend that Defendants either knew or should have known that Syncor stock was not a prudent Plan investment. [¶] Plaintiffs also allege that defendants had a conflict of interest because a significant percentage of their compensation was tied to Syncor stock. As such, defendants had an incentive to keep the Plan's assets in the Syncor plan and to keep the Syncor Stock Fund investing in Syncor stock. This investment elevated the demand for Syncor stock in the market and retained a favorable impression of the stock with Wall Street analysts. [¶] The second cause of action focuses on the duty of Syncor and the remaining Director Defendants to properly monitor their appointees, including their appointees to the Plan committee. This duty included a duty to provide complete information to the appointees and to

monitor the performance of the appointees. Plaintiffs allege that Syncor and the Director Defendants (collectively "Defendants") breached this duty by failing to warn their appointees of Syncor's illegal overseas practices and by failing to ensure the appointees "appreciated the huge risk inherent in the significant investment by rank and file employees in an undiversified employer stock fund." [¶] Plaintiffs seek the following relief: 1) a declaration that the Defendants have breached their ERISA fiduciary duties to the participants; 2) a declaration that the Defendants are not entitled to the protections of ERISA section 404(c)(1)(B); 3) an order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' alleged breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investments; to restore to the Plan all profits the Defendants made through use of the Plan assets; and to restore all profits the Plan would have made if the Defendants had fulfilled their fiduciary obligations; 4) imposition of a @constructive trust on any amounts by which the Defendants were unjustly enriched at the expense of the Plan; 5) an order enjoining Defendants from any further violations of their ERISA fiduciary obligations; 6) actual damages in the amount of any losses the Plan suffered to be allocated among the Plan participants' individual accounts in proportion to the accounts' losses; 7) an order that defendants allocate the Plan's recoveries to the accounts of all Plan participants who had any portion of their account balances invested in the common stock of Syncor maintained by the Plan in proportion to the accounts' losses; and 8) costs, attorney's fees and other equitable relief.

*In re Syncor ERISA Litigation,* 227 F.R.D. 338, 339–41 (C.D.Cal.2005) (some citations, footnotes omitted).

Additionally, the evidence presented by the parties establishes that, as part of the merg-

er discussions between Cardinal and Syncor, Cardinal began a due diligence review of Syncor's operations on or about May 2002, and that review was performed primarily by Cardinal personnel, assisted by the law firm Wachtell, Lipton, Rosen & Katz. Declaration of Brendan A. Ford, ¶ 2. During the course of Cardinal's due diligence review, and no later than October 29, 2002, Cardinal discovered information suggesting Syncor may have been involved in improper payments as part of its international operations, hired the accounting firm Ernst & Young to assist outside counsel, and informed Syncor of their findings. Ford Decl., ¶¶ 4–5; Declaration of Edwin Burgos, ¶ 4. In response, on November 4, 2002, Syncor established a Special Committee of outside directors to investigate Cardinal's information, authorized the law firm Skadden, Arps, Slate, Meagher & Flom LLP to conduct the investigation, and hired the accounting firm PriceWaterhouse–Coopers LLP to conduct a forensic accounting investigation. Burgos Decl., ¶ 4, T. David Copley Declaration, ¶ 6, Exh. 5.[1] Syncor's Board of Directors delegated all its powers and authorities to the Special Committee, including the powers to:

> make determinations regarding communications and disclosure between the Company and its counsel and third parties relating to the investigation, including U.S. and foreign government agencies, stockholders, the media, Cardinal and employees; authorize the waiver of attorney-client privilege in connection with any such communications; [and] negotiate and enter into any agreement with U.S. and foreign government agencies in connection with matters arising out of the investigation....

Copley Decl., ¶ 6, Exh. 5 at 4.

On November 4, 2002, the Special Committee determined it had six areas of focus, including:

> (1) conducting the investigation ...; (2) the process with respect to U.S. govern-

---

1. At Syncor's Board of Directors' meeting on November 4, 2004, Syncor's Board indicated its primary goals were:

    to ascertain the full extent of the problems, make full disclosure, identify all steps necessary to prevent their reoccurrence, and to use all efforts to protect the stockholders and the

Company to the extent possible from potential adverse effect resulting from these matters. The Board also believed it was important to continue moving forward on the transaction with Cardinal.

Copley Decl., ¶ 6, Exh. 5 at 3.

mental authorities, including the U.S. Department of Justice and the SEC; (3) the process with respect to any relevant foreign governmental authorities; (4) communication with key constituencies, including employees and stockholders; (5) any affect [sic] of the investigation and its findings on the Cardinal Health, Inc.... transaction; and (6) analysis of the review of these matters by the Company's auditors in the course of their review of the Company.

Copley Decl., ¶ 7, Exh. 6 at 1–2. Further, the Special Committee discussed:

the process for voluntarily approaching and cooperating fully with the U.S. Department of Justice and the SEC, and authorized Counsel to initiate contact with those agencies and to set up meetings to discuss the Company's findings to date. In connection with such meetings, the Committee authorized Counsel to waive the attorney-client privilege to the extent, if necessary, to allow Counsel to communicate all relevant information to ... those agencies. Counsel advised the Committee of issues concerning whether such disclosure could be used as the basis of a claim that such privilege had been waived for other purposes.

*Id.*

On November 5, 2002, Syncor's Board of Directors met and, among other things, was updated on:

2. The agreement between Syncor and the D.O.J. provides, in relevant part:

In light of the interest of the [D.O.J.] in determining whether there have been any violations of U.S. law, and in light of the interest of the Company in investigating and analyzing the circumstances and people involved in the events at issue, the Company expects to provide to the DOJ copies of documents and materials, information concerning interviews conducted by [counsel] and reports that may be generated (the "Confidential Materials"). [¶] Please be advised that, by producing the Confidential Materials pursuant to this agreement, the Company does not intend to waive the protection of the attorney work product doctrine, the attorney-client privilege, or any other privilege applicable as to third parties. The Company believes that the Confidential Materials are protected by, at a minimum, the attorney work product doctrine and the attorney-client privilege.... [¶] The [D.O.J.] agrees to provide the Company with notice of any request made to it for disclosure of the Confiden-

their discussions with the Department of Justice (the "DOJ") and the Staff of the Securities and Exchange Commission (the "SEC"). [Counsel] reported that the Company had been very proactive and responsive to the governmental authorities by seeking meetings with the DOJ and the SEC promptly upon receiving information regarding the potentially improper payments made by certain international subsidiaries of the Company and that the governmental authorities had been appreciative of the Company's coming forward so promptly.

Copley Decl., ¶ 8, Exh. 7 at 3. The Special Committee met telephonically on November 6, 2002, at which time it discussed the status of the investigation, and the agenda for the forthcoming meetings with the Department of Justice ("D.O.J.") and the Securities and Exchange Commission ("S.E.C.") and the fact that Syncor "would be providing the governmental officials with copies of the report ... prepared by Ernst & Young LLP, Cardinal's auditors, regarding the Company's activities in Taiwan and China." Copley Decl., ¶ 9, Exh. 8 at 2.

On November 7, 2002, Cardinal and Syncor entered into agreements with the D.O.J. and the S.E.C.[2] Ford Decl., ¶ 9; Declaration of Carl S. Rauh, ¶ 2; Copley Decl., ¶ 10, Exh.

tial Materials pursuant to the Freedom of Information Act and to provide the Company with an opportunity to state its objections to any disclosure. [¶] The [D.O.J.] will not assert that the Company's production of the Confidential Materials to the [D.O.J.] constitutes a waiver of the protection of the attorney work product doctrine, the attorney-client privilege, or any other privilege as to these materials—or as to any other material or testimony as to which the Company may assert a privilege.

Rauh Decl., ¶ 2, Exh. 1; Copley Decl., ¶ 10, Exh. 9. The agreement between Syncor and the S.E.C. is substantially similar, except that it also states the S.E.C.:

will maintain the confidentiality of the Confidential Materials pursuant to this agreement and will not disclose them to any third party, except to the extent that the [S.E.C.] determines that disclosure is otherwise required by law or would be in furtherance of the [S.E.C.'s] discharge of its duties and responsibilities.

Rauh Decl., ¶ 2, Exh. 2 (emphasis added); Copley Decl., ¶ 10, Exh. 9 (emphasis added). The

9. Under these agreements, Cardinal provided copies of Ernst & Young's draft and final reports to the D.O.J. and S.E.C., and Syncor provided the results of its internal investigation to the D.O.J. and the S.E.C.[3] Ford Decl., ¶ 10; Burgos Decl., ¶ 7; Copley Decl., ¶ 10, Exh. 9.

On December 2, 2002, Syncor entered into an agreement with the Government (the D.O.J. and United States Attorney) in which the Government agrees not to "investigate or prosecute Syncor, or any successor, for the foreign payments or the accounting thereof disclosed by Syncor to the [Government]" provided Syncor fully performs certain conditions, including: (1) Syncor Taiwan, Inc., fully performs its obligations under a plea agreement (discussed below); (2) Syncor fully performs its obligations under the Cease and Desist Order entered into between it and the S.E.C.; (3) Syncor fully and truthfully cooperates with the Government "as set forth in paragraph 5 of this agreement";[4] and (4) Syncor fully implements certain remedial measures. Copley Decl., ¶ 13, Exh. 12. Furthermore, the agreement provides that if Syncor "has knowingly and willfully failed to comply with any provision of this agreement, or ha[s] committed any crime during the pendency of this agreement," the Government, at its "sole option,"

> [may] be released from ... this agreement. ... Syncor understands that should any such breach of this agreement occur,

the [Government] will have the right to use against Syncor before any grand jury, at any trial, hearing or for sentencing purposes, any statements made by their employees and agents, and any information, materials, documents or objects provided by Syncor to the [Government] pursuant to this agreement without any limitation....

*Id.* at 4. Finally, the agreement provides that it:

> is the complete and only agreement between the parties with respect to the subject matter hereof. No promises, agreements or conditions have been entered into other than those set forth in this letter and in the Plea Agreement of Syncor Taiwan, Inc. entered into on this date. This agreement supersedes prior understandings, if any, of the parties, whether written or oral. This agreement cannot be modified other than in a written memorandum signed by the parties or on the record.

*Id.* at 5.

On December 10, 2002, in the United States District Court for the Central District of California, Syncor Taiwan pleaded guilty to, and was convicted, of one count of violating the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-1, et seq., and, as a result, was fined $2 million. *United States v. Syncor Taiwan, Inc.,* CR 02–1244; *see also* Copley Decl., ¶¶ 12–13, Exh. 11–12; Rauh Decl., ¶ 3.

---

agreements between Cardinal and the D.O.J. and the S.E.C. are substantially similar to the agreements set forth above. *Id.*

**3.** As reflected in the minutes of Syncor's Board of Directors' meeting on November 20, 2002, Cardinal's outside counsel expressed concern "about future prosecutions involving the matters discovered in the investigation," and Syncor's counsel reported that a representative of the D.O.J. said:

> he could provide Cardinal an opinion letter under the Foreign Corrupt Practices Act to give them comfort that their due diligence efforts had been sufficient and no action would be taken against Cardinal regarding issues identified in the due diligence.

Copley Decl., ¶ 11, Exh. 10 at 2. Counsel further reported that the D.O.J. representative had said: if requested, he would inform the other governmental agencies of Syncor's and Cardinal's cooperation regarding the investigation[,] ...

> [and] emphasized that one consideration in the DOJ's willingness to work with the Company towards a resolution in such an expeditious manner was the strength of Cardinal's internal compliance program.

*Id.*

**4.** Paragraph 5 of the agreement requires Syncor to voluntarily provide or produce to the Government: full disclosure of all information "of improper or illicit conduct"; "all documents, records, or other tangible evidence relating to such conduct"; "originals and copies of documents and records relating to such conduct"; "all memoranda of interviews compiled and prepared by Syncor's counsel, outside counsel, consultants, accountants or other agents of interviews with individuals with respect to such conduct"; and "full disclosure to foreign law enforcement agencies and cooperate fully with those agencies with respect to such conduct disclosed to the [Government]...." *Id.*

## II

Defendant Monty Fu is Syncor's former Chairman of the Board. Jt. Stip. at 1:4–9, 8:25–26. On an unspecified date, plaintiffs served defendant Fu with requests for production of documents seeking 115 categories of documents. On February 18, 2005, defendant Fu raised various objections to those requests, including the objection that responding

> is unreasonable and unduly burdensome because of the impact that responding could have in this matter and on parallel government civil and criminal investigations. [Specifically,] ... not deferring a response may undermine Fu's Fifth Amendment privilege against self-incrimination, otherwise prejudice Fu in his ability to fully defend himself in a criminal or civil proceeding initiated by the government, or unreasonably require Fu to choose between waiving his Fifth Amendment rights or being saddled by an adverse inference in a civil proceeding[.]

Jt. Stip., Exh. 2:2–19. Additionally, defendant Fu noted that "Plaintiffs may continue to prosecute this case expeditiously by obtaining documents and information from the Company, which is the party to whom these requests should properly be directed[.]" *Id.*

### DISCUSSION

### III

The Federal Rules of Civil Procedure "shall be construed and administered to secure the just, speedy, and inexpensive determination of every action." Fed.R.Civ.P. 1. "There probably is no provision in the federal rules that is more important than this mandate. It reflects the spirit in which the rules were conceived and written, and in which they should be, and by and large have been, interpreted...." *Trevino v. Celanese Corp.,* 701 F.2d 397, 405 (5th Cir.1983) (citation omitted).

▪ Rule 26(b)(1) permits discovery in civil actions of "any matter, not privileged, that is relevant to the claim or defense of any party...." Generally, the purpose of discovery is to remove surprise from trial preparation so the parties can obtain evidence neces-

sary to evaluate and resolve their dispute. *Oakes v. Halvorsen Marine Ltd.,* 179 F.R.D. 281, 283 (C.D.Cal.1998). The party who resists discovery has the burden to show discovery should not be allowed, and has the burden of clarifying, explaining, and supporting its objections. *Blankenship v. Hearst Corp.,* 519 F.2d 418, 429 (9th Cir.1975).

▪ Questions of evidentiary privilege arising in the course of the adjudication of federal rights, such as here, are governed by the principles of federal common law. *United States v. Zolin,* 491 U.S. 554, 562, 109 S.Ct. 2619, 2625, 105 L.Ed.2d 469 (1989); Fed.R.Evid. 501. Under the attorney-client privilege, "[c]onfidential disclosures by a client to an attorney made in order to obtain legal assistance are privileged." *Fisher v. United States,* 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976); *Clarke v. American Commerce Nat'l Bank,* 974 F.2d 127, 129 (9th Cir.1992). The attorney-client privilege may be divided into eight essential elements: " '(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived.' " *In re Grand Jury Investigation,* 974 F.2d 1068, 1071 n. 2 (9th Cir.1992); *United States v. Martin,* 278 F.3d 988, 999 (9th Cir.2002). A corporation may claim the attorney-client privilege. *Commodity Futures Trading Comm'n. v. Weintraub,* 471 U.S. 343, 348, 105 S.Ct. 1986, 1990, 85 L.Ed.2d 372 (1985); *Upjohn Co. v. United States,* 449 U.S. 383, 390, 101 S.Ct. 677, 683, 66 L.Ed.2d 584 (1981).

▪ Because the attorney-client privilege is in derogation of the search for truth, it is "narrowly and strictly construed." *United States v. Gray,* 876 F.2d 1411, 1415 (9th Cir.1989), *cert. denied,* 495 U.S. 930, 110 S.Ct. 2168, 109 L.Ed.2d 497 (1990); *see also Fisher,* 425 U.S. at 403, 96 S.Ct. at 1569 (holding since attorney-client privilege "has the effect of withholding relevant information from the factfinder, it applies only where

necessary to achieve its purpose"). "The burden is on the party asserting the privilege to establish all the elements of the privilege[,]" *Martin*, 278 F.3d at 999–1000; *United States v. Blackman*, 72 F.3d 1418, 1423 (9th Cir.1995), *cert. denied*, 519 U.S. 911, 117 S.Ct. 275, 136 L.Ed.2d 198 (1996), and an assertion of privilege without evidence to support it will not prevail. *Hollins v. Powell*, 773 F.2d 191, 196 (8th Cir.1985), *cert. denied*, 475 U.S. 1119, 106 S.Ct. 1635, 90 L.Ed.2d 181 (1986); *see also Saxholm AS v. Dynal, Inc.*, 164 F.R.D. 331, 333 (E.D.N.Y.1996) (establishing applicability of attorney-client privilege "requires the submission of affidavits or other competent evidence to establish sufficient facts to prove the applicability of the privilege. Conclusory or ipse dixit assertions are not enough." (citations omitted)).

■ Under the work product doctrine, material obtained and prepared by an attorney or the attorney's agent in anticipation of litigation or preparation for trial may be immune from discovery. Fed.R.Civ.P. 26(b)(3); *Hickman v. Taylor*, 329 U.S. 495, 509–12, 67 S.Ct. 385, 392–94, 91 L.Ed. 451 (1947). One of the primary purposes of the work product doctrine is to prevent one party exploiting the other party's efforts to prepare for litigation. *Holmgren v. State Farm Mut. Auto. Ins. Co.*, 976 F.2d 573, 576 (9th Cir.1992); *Admiral Ins. Co. v. United States Dist. Court*, 881 F.2d 1486, 1494 (9th Cir. 1989). The work product doctrine establishes a qualified immunity, rather than a privilege, and the qualification of the immunity is to be determined upon a showing of necessity or good cause. *Admiral Ins. Co.*, 881 F.2d at 1494; *Doubleday v. Ruh*, 149 F.R.D. 601, 605 n. 3 (E.D.Cal.1993). The party claiming work product immunity has the burden of proving the applicability of the doctrine. *United States v. City of Torrance*, 163 F.R.D. 590, 593 (C.D.Cal.1995).

Plaintiffs seek to compel defendant Syncor to produce four categories of documents, all of which were previously produced by Syncor to the D.O.J. or the S.E.C. (collectively "Government") in connection with the investigation by those agencies of Syncor: (1) Cardinal's due diligence reports (Privilege Log nos. 2, 107–33, 135–38, 153–68); (2) Syncor's internal investigation (Privilege Log nos. 1, 5–106, 139); (3) in-house counsel memoranda (Privilege Log no. 3–4); and (4) legal analysis (Privilege Log no. 134). Copley Decl., ¶ 2, Exh. 1. Defendant Syncor, however, contends these documents are protected from discovery by the attorney-client privilege and the work product doctrine.

■ As an initial matter, it is not at all clear that the documents plaintiffs seek ever were, or are now, protected by the attorney-client privilege or work product doctrine, and defendant Syncor has provided insufficient evidentiary support for its contention that they are protected.[5] *Hollins*, 773 F.2d at 196; *Saxholm AS*, 164 F.R.D. at 333; *City of Torrance*, 163 F.R.D. at 593. Further, the first category of documents, those prepared by Cardinal during the due

---

5. To support its claims of attorney-client privilege and work product protection, defendant Syncor has provided the declarations of Mr. Ford, Cardinal's Executive Vice–President, Mr. Burgos, Syncor's General Counsel from December 2001 to January 2003, and Mr. Rauh, a partner in the law firm Skadden, Arps. However, other than Mr. Ford, who specifically refers to the Ernst & Young reports, none of these declarants states, on a document by document basis, the grounds for claiming attorney-client privilege or work product protection for the documents on Syncor's privilege log. Regarding the Ernst & Young reports, Mr. Ford states:

> Cardinal's purposes in authorizing [Ernst & Young] to conduct a factual investigation and to create reports regarding the purported Syncor payment activities included the following: 1) to enable Cardinal to obtain legal advice from its counsel, Wachtell, regarding the im-

pact, if any, of the purported payment activities on the proposed Cardinal–Syncor merger; 2) to enable Cardinal to assess Syncor's legal position with respect to government agencies, including the SEC and DOJ, that might have an interest in investigating the activities; 3) to prepare for litigation or any administrative action that would likely result in the event that the purported improper activities were disclosed to or otherwise discovered by the government; and 4) to assess the financial impact, if any, of the information discovered during due diligence.

Ford Decl., ¶ 7. Yet, as discussed in the chronology set forth above, it appears that one of Cardinal's primary concerns was that it might be brought into any governmental investigation of Syncor, and, thus, Cardinal quickly decided to voluntarily cooperate with governmental authorities for its own business purposes.

diligence required before its acquisition of Syncor, "cannot fall within the ambit of the attorney-client privilege[, which] ... protects only communications between a lawyer and client." *Dombrowski v. Bell Atlantic Corp.,* 128 F.Supp.2d 216, 219 (E.D.Pa.2000). Here, Cardinal's initial review of Syncor's operations was solely for the business purpose of a potential merger. Moreover, the joint defense privilege propounded by defendant Syncor presupposes the existence of an otherwise valid underlying privilege, such as the attorney-client privilege, which has not been shown to be present. *United States v. Henke,* 222 F.3d 633, 637 (9th Cir.2000) (per curiam); *Cavallaro v. United States,* 284 F.3d 236, 250 (1st Cir.2002); *In re Grand Jury Subpoenas,* 902 F.2d 244, 249 (4th Cir. 1990). Further, neither the attorney-client privilege nor the work product doctrine applies to the second category of documents, those prepared during the internal investigation of Syncor, since those documents were created with the intent to disclose them to the Government, if necessary, to benefit Syncor in any governmental investigation; thus, they were never privileged.[6] *United States v. Bergonzi,* 216 F.R.D. 487, 494 n. 8 (N.D.Cal.2003).

▆▆▆▆▆ Even assuming arguendo the documents were protected by the attorney-client privilege and the work product doctrine, it appears to the Court that Syncor's (and Cardinal's) disclosure(s) of the documents to the Government waived whatever attorney-client privilege and work product protection these documents might have had.[7] Generally, the voluntary disclosure of a privileged attorney-client communication to a third party waives the privilege, *United States v. Plache,* 913 F.2d 1375, 1379 (9th Cir.1990); *Weil v. Investment/Indicators, Research & Mgmt.,* 647 F.2d 18, 24 (9th Cir.1981), and the work product protection is waived where the disclosure of an otherwise privileged document is made to a third party and that disclosure enables an adversary to gain access to the information. *United States v. Mass. Inst. of Tech.,* 129 F.3d 681, 687 (1st Cir.1997); *Bergonzi,* 216 F.R.D. at 497. Although the work product doctrine provides protection only against adversaries, and, thus, "is not as easily waived as the attorney-client privilege[,]" *Mass. Inst. of Tech.,* 129 F.3d at 687, "the standard for waiving the work-product doctrine should be no more stringent than the standard for waiving the attorney-client privilege." *Westinghouse Elec. Corp. v. Republic of the Philippines,* 951 F.2d 1414, 1429 (3d Cir.1991); *Columbia/HCA Healthcare,* 293 F.3d at 307.[8]

**6.** The practice of S.E.C. access to corporate reports stemming from internal investigations of illegal corporate practices is explained by the Sixth Circuit, as follows:

> During the mid 1970s, information came to light that many of the largest corporations in the United States had paid numerous bribes to foreign officials (as well as made secretive domestic political contributions) to obtain overseas business. The SEC initiated a "voluntary disclosure program" to encourage corporate America to reveal *past misdeeds and publicly* disclose the accounting and tax fraud used to hide the payments. In exchange for "coming clean," the SEC agreed not to pursue certain enforcement actions. In most situations, the companies created internal auditing committees which, with the assistance of outside legal counsel, prepared reports documenting the full extent any illegal practices at the company. It is against this background that many of the reported cases ... arose.

*In re Columbia/HCA Healthcare Corp. Billing Practices Litigation,* 293 F.3d 289, 295 n. 7 (6th Cir.2002), *cert. dismissed,* 539 U.S. 977, 124 S.Ct. 27, 156 L.Ed.2d 690 (2003).

**7.** At oral argument, defendant Syncor's counsel argued against waiver, citing *Hewlett–Packard Co. v. Bausch & Lomb Inc.,* 115 F.R.D. 308 (N.D.Cal.1987). However, that opinion "was influenced by the potential effects of finding waiver too freely in commercial transactions such as the sale of a business." *Griffith v. Davis,* 161 F.R.D. 687, 700–01 (C.D.Cal.1995). In Hewlett–Packard, the issue before the court was whether the disclosure of a company's attorney's opinion letter concerning the validity and possible infringement of a company patent to a nonparty with whom it was attempting to negotiate the sale of a business waived the company's attorney-client privilege or work product doctrine. Here, defendant Syncor's disclosures to Cardinal are not the basis of the Court's rulings; thus, Hewlett–Packard is inapposite.

**8.** In other words, although the standard for determining waiver of the attorney-client privilege and the work product doctrine are essentially the same, in assessing whether the work product doctrine has been waived, the Court must also consider whether the disclosure enabled an adversary to gain access to the information. *Westinghouse Elec. Corp.,* 951 F.2d at 1428; *Fidelity*

Moreover, once a party has disclosed work product to an adversary, it has waived work product protection as to all other adversaries. *Westinghouse Elec. Corp.*, 951 F.2d at 1429; *Bergonzi*, 216 F.R.D. at 498.

Defendant Syncor, however, contends its disclosures to the Government were "limited" or "selective" waivers, rather than general waivers applicable to all third parties. There is no merit to this contention.

First, the confidentiality agreement between Syncor and the S.E.C. is a **conditional** confidentiality agreement, requiring the S.E.C. to keep the documents given to it by Syncor confidential *"except to the extent that the [SEC] determines that disclosure is otherwise required by law or would be in furtherance of the [SEC's] discharge of its duties and responsibilities."* Rauh Decl., ¶ 2, Exh. 2 (emphasis added); Copley Decl., ¶ 10, Exh. 9 (emphasis added). Language such as this, which gives the sole discretion to the Government to destroy any confidentiality, is inconsistent with those cases, discussed below, allowing selective waiver. *Bergonzi*, 216 F.R.D. at 496–97 n. 10. Moreover, the confidentiality agreement between Syncor and the D.O.J. dated November 7, 2002, was superceded by the "complete and only" agreement between Syncor and the Government entered into on December 2, 2002, and the December agreement has no confidentiality requirements. *See* Copley Decl., ¶ 13, Exh. 12. To the contrary, the December agreement contains provisions antithetical to the attorney-client privilege and work product protection, including the requirement that Syncor disclose documents to, and cooperate with, foreign law enforcement agencies. *Id.*

Although the Ninth Circuit has not yet determined whether selective waiver of the attorney-client privilege or work product protection is available, *Bergonzi*, 403 F.3d 1048, 1050 (9th Cir.2005) (per curiam); *Bittaker v. Woodford*, 331 F.3d 715, 720 n. 5 (9th Cir.) (en banc), other circuit courts have generally found it is not available. However, the Eighth Circuit has held that selective waiver is allowed, but offered little or no analysis for its holding. *Diversified Indus., Inc. v. Meredith*, 572 F.2d 596 (8th Cir.1977) (en banc).[9] Every other circuit to consider the matter has rejected the Eighth Circuit's approach. *See In re Columbia/HCA Healthcare Corp.*, 293 F.3d at 304, 307; *Mass. Inst. of Tech.*, 129 F.3d at 686–87; *In re Steinhardt Partners*, 9 F.3d at 235; *Westinghouse Elec. Corp.*, 951 F.2d at 1425–27, 1429–30; *The Permian Corp. v. United States*, 665 F.2d 1214, 1220–21 (D.C.Cir.1981); *In re Weiss*, 596 F.2d 1185, 1186 (4th Cir.1979) (per curiam). However, one circuit court has suggested that a selective waiver may be permissible in certain circumstances, especially where the Government agrees to confidentiality. *See In re Steinhardt Partners*, 9 F.3d at 236.

Here, the Court finds defendant Syncor (and Cardinal) waived the attorney-client privilege and the work product protection when it disclosed Cardinal's due diligence and Syncor's internal investigation documents to the Government. First, by voluntarily turning those documents over to the Government, Syncor (and Cardinal) acted in a manner "to gain tactical or strategic advantage." *In re Columbia/HCA*

---

& Deposit Co. of Md. v. McCulloch, 168 F.R.D. 516, 521 n. 4 (E.D.Pa.1996). Here, there is no doubt that, in the context of Syncor's illegal activity, the Government was Syncor's adversary. *Westinghouse Elec. Corp.*, 951 F.2d at 1428; *Bergonzi*, 216 F.R.D. at 497–98; *see also In re Steinhardt Partners*, 9 F.3d 230, 234 (2d Cir.1993) ("[T]he presence of an adversarial relationship does not depend on the existence of litigation. Additionally, the fact that Steinhardt cooperated voluntarily does not transform the relationship from adversarial to friendly."); *In re Subpoenas Duces Tecum*, 738 F.2d 1367, 1372 (D.C.Cir. 1984) ("There is no question that the SEC was an adversary to Tesoro. This was not a partnership between allies. Tesoro was not simply assisting

the SEC in doing its job. Rather, Tesoro independently and voluntarily chose to participate in a thorough disclosure program, in return for which it received the *quid pro quo* of lenient punishment for any wrongdoings exposed in the process.").

9. It appears the Eighth Circuit was concerned that "[t]o hold otherwise may have the effect of thwarting the developing procedure of corporations to employ independent outside counsel to investigate and advise them in order to protect stockholders, potential stockholders and customers." *Meredith*, 572 F.2d at 611.

*Healthcare Corp.,* 293 F.3d at 302 (internal quotation marks omitted); *In re Steinhardt Partners,* 9 F.3d at 235. Thus, waiving the attorney-client privilege and work product doctrine were to the benefit of Syncor (and Cardinal), and done with their complete, knowing and full consent. *In re Columbia/HCA Healthcare Corp.,* 293 F.3d at 302–03 (citation omitted); *see also In re Subpoenas Duces Tecum,* 738 F.2d at 1370, 1372 ("A client cannot waive [the attorney-client] privilege in circumstances where disclosure might be beneficial while maintaining it in other circumstances where nondisclosure would be beneficial. Fairness and consistency require that [parties] not be allowed to gain the substantial advantages accruing to voluntary disclosure of work product to one adversary—the SEC—while being able to maintain another advantage inherent in protecting that same work product from other adversaries."). In short, a corporation should not "be permitted to pick and choose among [its] opponents, waiving the privilege for some and resurrecting the claim of confidentiality to obstruct others, or to invoke the privilege as to communications whose confidentiality he has already compromised for his own benefit." *The Permian Corp.,* 665 F.2d at 1221; *In re Columbia/HCA Healthcare Corp.,* 293 F.3d at 303; *see also In re Subpoenas Duces Tecum,* 738 F.2d at 1372 ("It would . . . be inconsistent and unfair to allow [parties] to select according to their own self-interest to which adversaries they will allow access to the materials [they disclosed to the SEC].").

Second, selective waiver "does not serve the purpose [behind the attorney-client privilege] of encouraging full disclosure to one's attorney in order to obtain informed legal assistance; it merely encourages voluntary disclosure to government agencies, thereby extending the [attorney-client] privilege beyond its intended purpose." *Westinghouse Elec. Corp.,* 951 F.2d at 1425; *see also In re Columbia/HCA Healthcare Corp.,* 293 F.3d at 302 ("The attorney-client privilege was never designed to protect conversations between a client and the Government—i.e., an adverse party—rather, it pertains only to conversations between the client and *his or her* attorney." (emphasis in original)).

Third, although selective waiver might provide additional incentive for a corporation's cooperation with the Government, there is absolutely no evidence demonstrating that the disallowance of selective waiver would impede the voluntary cooperation of a corporation with the Government. *In re Lupron Marketing and Sales Practices Litigation,* 313 F.Supp.2d 8, 11 n. 9 (D.Mass.2004); *see also In re Steinhardt Partners,* 9 F.3d at 236 ("The SEC has continued to receive voluntary cooperation from subjects of investigations, notwithstanding the rejection of the selective waiver doctrine by two circuits and public statements from Directors of the Enforcement Division that the SEC considers voluntary disclosures to be discoverable and admissible."); *Westinghouse Elec. Corp.,* 951 F.2d at 1426 ("[M]any other corporations . . . have chosen to cooperate with the SEC despite the lack of an established privilege protecting their disclosures."). To the contrary,

> a corporation has substantial incentives to cooperate with [governmental] requests for assistance. Voluntary cooperation offers a corporation an opportunity to avoid extended formal investigation and enforcement litigation by the SEC, the possibility of leniency for prior misdeeds, and an opportunity to narrow the issues in any resulting litigation. These incentives exist regardless of whether private third party litigants have access to attorney work product disclosed to the SEC. "When a corporation elects to participate in a voluntary disclosure program like the SEC's, it necessarily decides that the benefits of participation outweigh the benefits of confidentiality. . . . It forgoes some of the traditional protections of the adversary system in order to avoid some of the traditional burdens that accompany adversary resolution of disputes, especially disputes with such formidable adversaries as the SEC."

*In re Steinhardt Partners,* 9 F.3d at 236 (citations omitted); *In re Subpoenas Duces*

*Tecum,* 738 F.2d at 1372.[10]

Finally, "[g]overnmental agencies 'have means to secure the information they need' other than through voluntary cooperation achieved via selective waiver (albeit at a higher cost in time and money)." *Columbia/HCA Healthcare Corp.,* 293 F.3d at 303 (quoting *Mass. Inst. of Tech.,* 129 F.3d at 685). Thus, there is "little reason to believe" that the public interest in voluntary cooperation with governmental investigations "outweighs 'the fundamental principle that the public ... has a right to every man's evidence.'" *Westinghouse Elec. Corp.,* 951 F.2d at 1425–26 (citation and some internal quotation marks omitted). From a public policy perspective, confidential agreements between the Government and the corporations being investigated should not be used "to assist wrongdoers in concealing the information from the public domain." *In re Columbia/HCA Healthcare Corp.,* 293 F.3d at 303.

For all these reasons, defendant Syncor has not met its burden of demonstrating the documents sought by plaintiffs are protected by the attorney-client privilege and work product doctrine, and plaintiffs' motion to compel the production of these documents should be granted.

## IV

█ The Fifth Amendment privilege against self-incrimination applies in civil proceedings. *United States v. Balsys,* 524 U.S. 666, 671–72, 118 S.Ct. 2218, 2222, 141 L.Ed.2d 575 (1998); *Lefkowitz v. Turley,* 414 U.S. 70, 77, 94 S.Ct. 316, 322, 38 L.Ed.2d 274 (1973). Indeed,

> [t]he privilege is not ordinarily dependent upon the nature of the proceeding in which the testimony is sought or is to be used. It applies alike to civil and criminal proceedings, wherever the answer might tend to subject to criminal responsibility him who gives it. The privilege protects a mere witness as fully as it does one who is also a party defendant.

*McCarthy v. Arndstein,* 266 U.S. 34, 40, 45 S.Ct. 16, 17, 69 L.Ed. 158 (1924). "However,

in the civil context, the invocation of the privilege is limited to those circumstances in which the person invoking the privilege reasonably believes that his disclosures could be used in a criminal prosecution, or could lead to other evidence that could be used in that manner." *Doe v. Glanzer,* 232 F.3d 1258, 1263 (9th Cir.2000); *United States v. Bodwell,* 66 F.3d 1000, 1001 (9th Cir.1995) (per curiam). Finally, "'[t]he privilege afforded not only extends to answers that would in themselves support a conviction ... but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a ... crime.'" *United States v. Hubbell,* 530 U.S. 27, 38, 120 S.Ct. 2037, 2044, 147 L.Ed.2d 24 (2000) (quoting *Hoffman v. United States,* 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951)); *Balsys,* 524 U.S. at 671–72, 118 S.Ct. at 2222.

█ Although a request for the production of documents compels "the act of producing the document[s,]" *Fisher v. United States,* 425 U.S. 391, 410 n. 11, 96 S.Ct. 1569, 1580–81 n. 11, 48 L.Ed.2d 39 (1976); *Baltimore City Dep't of Soc. Servs. v. Bouknight,* 493 U.S. 549, 554–55, 110 S.Ct. 900, 905, 107 L.Ed.2d 992 (1990), the act itself may implicate the privilege against self-incrimination "because the act of complying with the ... demand testifies to the existence, possession, or authenticity of the things produced." *Bouknight,* 493 U.S. at 555, 110 S.Ct. at 905; *Fisher,* 425 U.S. at 410, 96 S.Ct. at 1581; *see also In re Grand Jury Subpoena,* 383 F.3d 905, 909 (9th Cir.2004) ("By producing documents in compliance with a subpoena, the witness admits that the documents exist, are in his possession or control, and are authentic. These types of admissions implicitly communicate statements of fact that may lead to incriminating evidence." (citations omitted)).

█ Here, there is no doubt that defendant Fu is involved in multiple legal proceedings, and "was and is under investigation by the DOJ for his involvement in an alleged bribery scheme involving Syncor Taiwan ...." Jt. Stip., Exh. 6 at 3:3–4:4; *see also* Jt. Stip. at 10:18–21 & n. 5 (stating Government has convened a grand jury to

10. As detailed above, it was clearly to Syncor's (and Cardinal's) advantage to cooperate with the Government, as its counsel, Board members and Special Committee members all recognized.

investigate charges against defendant Fu). Yet, plaintiffs have filed a motion to compel defendant Fu to produce a privilege log identifying the documents he has withheld on the basis of his Fifth Amendment privilege. Defendant Fu, however, contends that the mere production of a privilege log would violate his privilege against self-incrimination in light of the Government's ongoing investigation of his actions in regard to Syncor Taiwan.

Plaintiffs' 115 requests for the production of documents seek a wide variety of documents from defendant Fu.[11] An examination of some of these requests, however, clearly shows plaintiffs seek information implicating defendant Fu's Fifth Amendment rights. For example, Request no. 5 seeks documents concerning Syncor's overseas sales of radiopharmaceutical products and services, including but not limited to the foreign bribery scheme conducted in connection with such sales." Similarly, Request no. 6 seeks documents concerning "bribes," "kickbacks," "gifts or other financial support paid . . . in connection with its sales of radiopharmaceutical products and services." Likewise, Request no. 11 seeks documents "concerning Syncor's violations of the Foreign Corrupt Practices Act ("FCPA")," and Request no. 12 seeks documents "concerning Syncor's violations of the foreign laws and regulations . . . of Taiwan, Mexico, Belgium, Luxembourg, France, and the European Union." Finally, Request no. 19 seeks all documents "created by, sent to, reviewed, or received by Monty Fu concerning the Plan and/or overseas sales or promotion of radiopharmaceutical products and/or services. . . ."

As these examples make clear, some of plaintiffs' document requests implicate defendant Fu's Fifth Amendment rights, so that requiring defendant Fu to produce a privilege log listing responsive documents may incriminate defendant Fu by forcing him to "admit[ ] that the documents exist, are in his possession or control, and are authentic." *In re Grand Jury Subpoena*, 383 F.3d at 909. On the other hand, it may be that other of

plaintiffs' document requests do not implicate defendant Fu's Fifth Amendment rights. However, since the parties have treated the document requests *in toto,* and some of them clearly do impinge upon defendant Fu's Fifth Amendment privilege against self-incrimination, plaintiffs' motion to compel defendant Fu to produce a privilege log should be denied.

In denying the motion to compel, the Court notes that, as defendant Fu suggests, many of the documents plaintiffs seek may be available from defendant Syncor, which has no privilege against self-incrimination, *Doe v. United States,* 487 U.S. 201, 206, 108 S.Ct. 2341, 2345, 101 L.Ed.2d 184 (1988); *Braswell v. United States,* 487 U.S. 99, 102, 108 S.Ct. 2284, 2287, 101 L.Ed.2d 98 (1988), and which, in light of the Court's other ruling herein, may not be able to withhold such documents from production.

### ORDER

1. Plaintiffs' motion to compel items on defendant Syncor International's privilege log is **GRANTED**.

2. Plaintiffs' motion to compel defendant Monty Fu to produce a privilege log is **DENIED**.

---

11. Unlike the other motion to compel, wherein the parties grouped into categories the 168 document requests for ease of review and discussion, they have not done that here, making the Court's analysis more difficult than it otherwise would

have been. Moreover, the parties have not provided the Court with plaintiffs' requests for production, and the Court, therefore, does not know the definitions, if any, provided by plaintiffs.